## COURT OF APPEALS.

### Nov., 1907.

## THE PEOPLE v. CORNELL VAN GAASBECK.

### (189 N. Y. 408.)

(1). CRIMES—EVIDENCE—GOOD CHARACTER—WITNESSES HAVING KNOWL-EDGE OF GENERAL REPUTATION OF ACCUSED MAY TESTIFY IN HIS BEHALF.

Upon a criminal prosecution the testimony of witnesses acquainted with the reputation and character of the accused is receivable as evidence in his behalf for the purpose of showing that he has enjoyed a good reputation in respect to the traits involved in the charge against him, and a witness who had been acquainted with a defendant charged with the crime of murder in the second degree, for a period of twenty-five or thirty years, is not disqualified from testifying to the community reputation of the accused as to peaceableness and quiet by the fact that for a period of five or six years before the trial the accused had lived in a place about ten miles distant from that in which the witness resided.

(2). SAME—WITNESSES MAY NOT TESTIFY AS TO CHARACTER OF ACCUSED SOLELY FROM PERSONAL KNOWLEDGE AND OBSERVATION.

Evidence is not receivable, however, in behalf of the accused as to the existence of such traits when such evidence consists solely of the personal knowledge and observation of his conduct by witnesses and not of their knowledge as to his reputation in such respects.

(3). NEGATIVE EVIDENCE—WHEN RECEIVABLE.

Negative evidence is receivable to establish a good reputation, and the testimony of a person, who has lived any considerable length of time in the same neighborhood as another, to the fact, that he has never heard anything against that other person in respect to his peaceableness or quiet behavior or honesty, is competent evidence that his reputation is that a person of pacific disposition and integrity.

*People* v. *Van Gaasbeck*, 118 App. Div. 511, 21 N. Y. Crim. 70, *ante*, affirmed.

APPEAL from an order of the Appellate Division of the Su-

preme Court in the third judicial department, entered March 12, 1907, which reversed a judgment of the Ulster County Court rendered upon a verdict convicting the defendant of the crime of manslaughter in the first degree, and granted a new trial.

The facts, so far as material, are stated in the opinion.

*Frederick Stephen, Jr., District Attorney (Howard Chipp* of counsel), for appellant. The objections were properly sustained because no foundation was laid for the proposed testimony by proof that the witnesses were acquainted with the reputation of the defendant. (1 Greenl. on Ev. §§ 101, 461; 1 Wigmore on Ev. § 692; 1 Roscoe on Crim. Ev. [8th ed.] 152; 3 Rice on Ev. § 375; 3 Wigmore on Ev. § 1980; *Carlson* v. *Winterson,* 147 N. Y. 652; *Cheritree* v. *Roggin,* 67 Barb. 124; *Douglas* v. *Tousey,* 2 Wend. 355; *People* v. *Mauch,* 24 How. Pr. 277; *State* v. *Ward,* 73 Iowa, 532.) Defendant's contention that the testimony should have been received, not as evidence of reputation, but as direct proof of defendant's disposition, as a fact, is untenable, since such proof was incompetent under the law of this state, as well as of most other jurisdictions. (*Sawyer* v. *People,* 91 N. Y. 667; *Sindram* v. *People,* 88 N. Y. 196; *Thomas* v. *People,* 67 N. Y. 218; *Berneker* v. *State,* 40 Neb. 810; *People* v. *Ah Lee Doon,* 97 Cal. 171; *Hussey* v. *State,* 87 Ala. 121; *Carthaus* v. *State,* 78 Wis. 560; *Reg.* v. *Rowton,* 10 Cox C. C. 25.)

*Augustus H. Van Buren* for respondent. The trial court erred in excluding the testimony offered as to the disposition and character of defendant as a quiet and peaceable man. (*Cancemi* v. *People,* 16 N. Y. 596; *Remsen* v. *People,* 43 N. Y. 76; *People* v. *Hughson,* 154 N. Y. 153; *Edington* v. *U. S.,* 164 U. S. 361; *People* v. *Lamb,* 2 Keyes, 360; *Stillman* v. *Sampson,* 42 App. Div. 623; *People* v. *Gallagher,* 75 App. Div.

39; *Thomas* v. *People*, 67 N. Y. 218; *People* v. *Rodawald*, 177 N. Y. 408; *State* v. *Sterrett*, 68 Iowa, 76; *State* v. *Lee*, 22 Minn. 407; *People* v. *Stewart*, 28 Cal. 396.)

WILLARD BARTLETT, J.   The defendant was indicted for the crime of murder in the second degree and convicted of manslaughter in the first degree.   The crime was charged to have been committed on the 4th day of December, 1905, at the town of Woodstock, in the county of Ulster.   The victim of the alleged homicide was Oscar Harrison, a white person about twenty years of age at the time of his death.   The defendant is a negro who at that time was about fifty-five years old.   Harrison was found dead in the dwelling of the defendant near Woodstock on the morning of December 5th, 1905, under circumstances which left no doubt that his death had been caused by means of blows upon his head with a blunt instrument, probably a hammer which was lying in the same room.   There was no direct evidence tending to show the commission of the crime by the defendant.   Harrison, it appeared, had been in the habit from time to time of visiting his house where the defendant lived alone and had occasionally spent the night there.   He was last seen alive there in the company of the defendant, on the day before he was found dead.   On the evening of that day the defendant, in an intoxicated condition, visited the post office and country store in Woodstock and subsequently went to the residence of some colored people named Conine, where he spent the night sleeping in a chair by the fire.   There appears to have been nothing unusual, however, in his conduct in this respect, as the testimony tends to show that he had frequently spent the night there in this manner on previous occasions.   In the morning one of the Conines suggested to defendant that he should go over to his house and see what had happened there on the previous night—saying that he, Conine, on his way from Woodstock the evening be-

fore had heard noises, groans, stamping on the floor and heavy breathing proceeding from the defendant's dwelling. The defendant thereupon went to his own house, being accompanied by Conine, whom he requested to go with him. The defendant went ahead, pushed the door open and found Harrison lying dead on the floor. He seems to have become agitated at the sight and asked Conine what he should do. Conine advised him to go to a neighbor's and telephone to Harrison's father, and the defendant acted upon this advice and proceeded to the residence of a neighbor named Wolven and said to him: "Will you telephone to John Harrison that Oscar is dead in my house. He has poisoned or killed himself in some way. I don't know how." The desired message was sent, and shortly afterward the defendant disappeared from the immediate neighborhood and proceeded to West Saugerties, where he spent the night in the house of an acquaintance, whence he walked the next day to Purling, in Greene county, where he was arrested by a deputy sheriff of Ulster county, named Everett Rosa. The testimony of this officer tended more strongly than any other evidence in the case to connect the defendant with the commission of the crime. After narrating the circumstances of the arrest and saying that he told the defendant he would have to go back and answer for the body lying dead in his house, this witness testified as follows: "We came to Jennings' Hotel and I said, 'Corn, you led me a merry chase.' Finally, he said, 'I didn't think I would get as far as I did.' I said, 'What did you lay the fellow out for in that way?' He said (dropping his head), 'I don't know,'"

The defendant was sworn as a witness in his own behalf, and said in explanation of his flight that he was scared, but did not know what he was to do, and that when he left Woodstock he had no idea where he was going. He denied having killed Harrison, but did not controvert the truth of the statement which I have quoted from the testimony of the deputy

sheriff who arrested him. He declared that the last that he ever saw of Harrison was on the afternoon before the discovery of the dead body, .when he started for Woodstock, and that Harrison was outside of the house going towards the dwelling of the Conines. There was considerable evidence in the case tending to show that the relations between Harrison and the defendant had always been friendly, although one witness, who testified to having seen Harrison and the defendant engaged in conversation on the afternoon before the homicide, said that while he could not understand the words which they used, " They were jangling quite sharp."

The questions which are presented for our determination on this appeal relate to the propriety of the exclusion by the trial court of certain proof which was offered in regard to the character of the accused; and I have cited the evidence thus fully to show that if any error was committed in this respect it cannot be disregarded in the exercise of our power to render judgment upon an appeal in a criminal case without regard to exceptions which do not affect the substantial rights of the parties. (Code of Criminal Procedure, § 542.)

The alleged errors upon which the Appellate Division has reversed the judgment of conviction arise upon exceptions to the exclusion of evidence which the defendant sought to obtain from two witnesses, Charles Merritt and Thomas B. Johnston. Merritt testified that he lived in Kingston; that he had known the defendant probably twenty-five or thirty years; that the defendant had worked for him on his farm off and on three, four or five years; that whenever he wanted extra help he used to go and get the defendant, and that he was acquainted with his reputation and his character so far as it related to whether or not he was of a quiet and peaceable disposition or otherwise. The witness was then asked: " What do you say his reputation is ? " This question was objected to on the ground that there had been no foundation laid for the proof, and on the further

ground that it was not the proper way to show character. The objection was sustained and the defendant excepted. The other witness, Johnston, testified that he was a policeman in the city of Kingston, and had been such for about nineteen years; that he had known the defendant thirty years; that he knew him when he was in the city, and knew his character " as to being a peaceable, quiet man." He was then asked: " What do you say of it?" This question was objected to, the objection was sustained, and an exception was taken in behalf of the defendant.

It will be observed that these exceptions present two entirely different questions. The ruling in respect to the evidence sought to be obtained from the witness Merritt was a ruling to the effect, *first,* that no sufficient foundation had been laid for the introduction of any proof whatever as to the character of the accused; and, *secondly,* that even if the witness were qualified to speak on this subject proof as to the general reputation of the defendant in regard to peaceableness and quiet was not admissible. By the second ruling in respect to the question put to the witness Johnston, the court held that it was not permissible for the defendant to give evidence tending to show that his character was that of a peaceable, quiet man based upon the personal knowledge and observation of the witness.

In our opinion the first ruling was erroneous and justified and required a reversal of the judgment; but the second ruling was correct.

" It is not necessary to cite authorities," says the Supreme Court of the United States in *Edgington* v. *U. S.* (164 U. S. 361), " to show that in criminal prosecutions the accused will be allowed to call witnesses to show that his character was such as to make it unlikely that he would be guilty of the particular crime with which he is charged." The precise question here, however, relates to the nature of the testimony which such witnesses are permitted to give for this purpose. Must

30

they be confined to a statement of their knowledge of the general reputation of the party whose conduct is under investigation as seems to be contended by the learned counsel for the appellant, or may they go further and testify as to his reputation in respect to the particular trait or traits involved in the issue? And again, must they be confined to the general reputation of the person whose character is in question in respect to such traits, or may they testify to the existence or non-existence of the particular traits involved basing their testimony upon their personal acquaintance with the party and their observation of his mode of life? The fact sought to be established by evidence bearing upon the character of an accused person is the improbability that the defendant would commit the crime of which he is accused. The evidence being adduced for this purpose, it is manifestly proper in order that it may be most useful in the guidance of the jury that it should not be confined to the general good reputation of the defendant but may be extended to his reputation in respect to the particular traits involved in the accusation. The common practice in this state seems to have been in accordance with this view. Thus, in the bill of exceptions in the celebrated murder case of *Cancemi* v. *People* (16 N. Y. 501), a leading authority on the admissibility of evidence of good character in behalf of an accused person, it is stated that defendant's counsel on the trial of the case called nineteen witnesses, all of them testified to the general good character of the defendant for *peace and quietness and for honesty and industry*. This seems to be the rule generally throughout the Union. In Massachusetts, where the defendant was prosecuted for assault with intent to kill, it was held to be competent for him to call witnesses to testify to his general reputation as a peaceable and quiet citizen (*Commonwealth* v. *O'Brien,* 119 Mass. 342.) In *People* v. *Ashe* (44 Cal. 288), which was a prosecution for grand larceny in San Joaquin county, the defendant " introduced evidence of his previous

good character for honesty and proved by credible witnesses who had resided in that county for some twenty years that during all that time his character for honesty was good." Here plainly the expression "character" is used as synonymous with "reputation." In the same state it has been held that where there is a question at the trial whether the defendant in a criminal prosecution has committed the act charged against him in the indictment, evidence of his previous good reputation in respect to the particular trait involved in the inquiry is admissible for the defense. If such good reputation is established it is a fact to be considered by the jury in connection with all the other facts in the case in determining whether or not the defendant actually did commit the offense of which he is accused. The weight to be given to the evidence of good reputation is, of course, wholly a matter for the jury.

The same doctrine is laid down in many other cases too numerous to cite. It is often found stated in connection with the qualifying rule which has been almost universally adopted in this country to the effect that, while the community reputation as to particular traits is admissible upon the question of character, the personal knowledge and belief of the witness must be excluded. (3 Wigmore on Evidence, § 1980.) Thus in *Hirschman* v. *People* (101 Ill. 568), where the defendant was tried on an indictment for manslaughter, it was held that he was properly permitted to give evidence of his general reputation in regard to peace and quiet; but that no error was committed in excluding all particular transactions in which he had been concerned tending to prove a quiet and peaceable disposition on the part of the accused. In *Berneken* v. *State* (40 Neb. 810) the defendant was accused of the crime of receiving stolen property. It was held that he unquestionably had the right to introduce evidence of his character or reputation, which the court regarded as convertible terms, for honesty in the community in which he had resided or his general reputation for

honesty; but that this could not be shown by evidence of particular and specific facts within the knowledge of the witness purporting to have been gained by personal acquaintance or dealings with the accused. In *State* v. *Dalton* (27 Mo. 13) the appellant was tried for a felonious assault with intent to kill. The defendant proved that his general character as a peaceable man was good, but the trial court sustained an objection to further inquiry as to his character for industry and this was held by the Supreme Court to be a correct ruling; " because whenever evidence of character is admissible it is restricted to the trait of character which is in issue and must have reference to the nature of the charge." " In a criminal prosecution the good character of a defendant is always admissible but the law limits the inquiry in such a case to his general character [reputation] as to the trait in issue." (*State* v. *King*, 78 Mo. 555.)

" The reputation which is the subject of proof in courts as evidence of character means the estimate in which the individual is held by the community and not the private opinion entertained of him by the witnesses who may be called to testify in reference to such fact." (*Jackson* v. *State*, 78 Ala. 471.) When, therefore, a witness is called to prove the good character of the defendant his testimony should not go beyond the reputation which the defendant sustains in the community as to the particular traits of character, the existence or non-existence of which bear upon the probability or improbability that he would commit or refrain from committing the offense with which he is charged. (*State* v. *Pearce*, 15 Nev. 188.)

The authorities which have been cited suffice to show that while the defendant in the case at bar was entitled to give evidence of his general reputation as a man of quiet and peaceable disposition he was not entitled to prove particular acts indicative of the fact that he possessed traits rendering it unlikely that he would assault his friend. The case of *Sawyer* v. *People* (91 N. Y. 667) is cited in behalf of the appellant as

holding a different doctrine, but an examination of the record on appeal therein shows that the rulings of the trial court in that case were in precise accordance with the law as we have stated it. (Court of Appeals Cases in Clerk's office, vol. 9, of 1883.)

In a few of the states, notably Iowa and Minnesota, the doctrine that the character of the defendant in a prosecution for homicide can be shown only by the evidence of his general good reputation or his reputation in the community as a person of quiet and peaceable disposition is rejected. The courts in those states go further and hold that a defendant in such a case is entitled to show by the personal observation and knowledge of witnesses called in his behalf that he possesses those traits of character which would render it unlikely that he committed the offense with which he is charged. (*State* v. *Sterrett*, 68 Iowa, 76; *State* v. *Lee*, 22 Minn. 407.) In the Iowa case it is said: "Evidence that he is reputed to possess certain traits of character may be competent evidence tending to prove that he does possess them, but it is by no means the only competent evidence of that fact. We see no reason why any witness who is shown to have had opportunity for forming a just estimate of his character should not be permitted to testify with reference to it."

This view, however, is opposed to the prevailing rule in England as established in *Reg.* v. *Rowton* (10 Cox's Crim. Cases, 25, 34), and, as we have seen, to the great weight of American authorities on the subject.

Professor Wigmore, in his scholarly treatise on the law of evidence, argues strongly in favor of a rule admitting evidence of personal knowledge and belief concerning the character of an accused person as against the rule which restricts such evidence to the general reputation of the accused in respect to the moral traits at issue in the prosecution, declaring that so far as practical policy and utility are concerned there

ought to be no hesitation between reputation and personal knowledge and belief. " A perusal of the records of state trials," he says, " will show how natural, straightforward and useful was this method ·of asking after belief founded on personal experience and intimacy. Put any one of us on trial for a false charge, and ask him whether he would not rather invoke in his vindication, as Lord KENYON said, ' the warm, affectionate testimony' of those few whose long intimacy and trust has made them ready to demonstrate their faith to the jury, than any amount of colorless assertions about reputation." (2 Wigmore on Evidence, § 1686.) The answer to this argument is found in overwhelming considerations of practical convenience. If a witness is to be permitted to testify to the character of an accused person, basing his testimony solely on his own knowledge and observation, he cannot logically be prohibited from stating the particular incidents affecting the defendant, and the particular actions of the defendant which have led him to his favorable conclusion. In most instances it would be utterly impossible for the prosecution to ascertain whether occurrences narrated by the witness as constituting the foundation of his conclusion were or were not true. They might be utterly false, and yet incapable of disproof at the time of trial. Furthermore, even if evidence were accessible to controvert the specific statements of the witness in this respect, its admission would lead to the introduction into the case of innumerable collateral issues which could not be tried out without introducing the utmost complication and confusion into the trial, tending to distract the minds of the jurymen and befog the chief issue in litigation.

It is argued in behalf of the People that no foundation was laid for the proposed testimony by proof that the witnesses were acquainted with the reputation of the defendant. We cannot accede to this proposition as applicable to the witness Merritt. Indeed, he was allowed to state, without objec-

tion, that he was acquainted with the reputation of the defendant so far as it related to whether or not the defendant was of a quiet and peaceable disposition. The witness had known the defendant twenty-five or thirty years, and lived in Kingston, where the defendant had worked up to a period within five or six years before the trial. The learned county judge in his charge speaks of the house of the defendant, in which the homicide occurred, as being " some few miles distant " from Kingston. While the reputation which is receivable in evidence on the question of character must be confined to the place of residence of the person whose character is under consideration, or the neighborhood of such residence, and the time when such reputation existed must not be too remote, we think that it cannot be held as matter of law that upon the evidence in this record the witness Merritt was not qualified to testify as to the community reputation of the defendant as to peaceableness and quiet. As has already been pointed out, the trial judge himself spoke of the defendant's dwelling as being only a few miles distant from Kingston where the witness resided; and we are probably authorized to take judicial notice of the fact that the distance between Kingston and Woodstock is not more than ten miles as the crow flies. (See *Mutual Benefit Life Ins. Co.* v. *Robinson,* 58 Fed. Rep. 723, where judicial notice was taken of the fact that the distance between two cities exceeded one hundred miles.) The time limit applicable to evidence of reputation is discussed by BEARDSLEY, J., in *Sleeper* v. *Van Middlesworth* (4 Denio, 431) where it was held to have been error to exclude evidence that four years before the trial the witness had already acquired a well-known character in the community where he resided. " No certain limit," said the court, " in point of duration can be laid down for inquiries like this." In an action for slander in imputing unchastity to a woman, the Supreme Judicial Court of Massachusetts has held that evidence of the female plaintiff's bad general reputation

*ten* years before the speaking of the words for which the suit is brought was competent; " it being a very general presumption that things which are proved to have once existed in a particular state, are to be understood as continuing in that state, until the contrary is established by evidence, either direct or presumptive." . (METCALF, J., in *Parkhurst* v. *Ketchum,* 6 Allen, 406.)

The questions which have led to the reversal of the judgment in this case below and the questions which seem almost certain to arise on the new trial render it proper for us to suggest that a witness may be qualified to testify to the general reputation of a person as to particular traits of character even though he may never have heard anybody say anything as to whether the person whose character is in question possesses such traits or not. In other words, the testimony of a person who has lived any considerable length of time in the same neighborhood as another to the fact that he has never heard anything against that other person in respect to his peaceableness or quiet behavior or honesty is competent evidence that his reputation is that of a person of pacific disposition and integrity. In *Regina* v. *Rowton (supra)*, COCKBURN, Ch. J., admitted the competency of the evidence of a witness who should say, " I never heard anything against the character of a person of whose character I come to speak." The same learned judge declared that although given in a negative form such testimony is the most cogent evidence of a man's good reputation because one's character does not get talked about until there is some fault to be found with it. Chief Justice NELSON in delivering the opinion of the old Supreme Court in *People* v. *Davis* (21 Wendell, 309) assumed that negative evidence was receivable to establish good character provable by reputation. " Character is proved by reputation and evidence that those who have known a man in the community never heard anything against his reputation as a peaceable man is evidence

of good reputation in that respect." (W. ALLEN, J., in *Day* v. *Ross,* 154 Mass. 13.) A witness is qualified to testify to the reputation of a defendant where the witness has been in such a position with reference to the defendant's residence or circle of acquaintances that the fact of his hearing nothing against him would have a tendency to show that nothing had been said against him and, therefore, that his reputation was good. (See *Holmes* v. *State,* 88 Ala. 26, 29.) It is even competent evidence of the good reputation of an accused person that the witness has been acquainted with him for a considerable time under such circumstances as render it likely that he would have heard what was said about him and that he has never heard anything about his character—" the fact that a person's character is not talked about at all being on grounds of common experience excellent evidence that he gives no occasion for censure or, in other words, that his character is good." (*State* v. *Lee,* 22 Minn. 407.) Indeed, as is well said by the Supreme Court of Illinois in *Gifford* v. *People* (148 Ill. 173), " one whose word passes current among his associates and neighbors, or who is received and accepted by society as a virtuous man or woman, or whose honesty is not questioned in the community in which he lives, will ordinarily excite no discussion or comment, and yet every person in the community knows that he or she is accepted, recognized and reputed to be a truthful, virtuous or honest person." (See, also, *Gandolfo* v. *State,* 11 Ohio St. 114; *Milliken* v. *Long,* 188 Pa. St. 411.)

In some instances negative evidence of good reputation has been characterized as the best evidence on the subject. Chief Justice COCKBURN, in the *Rowton* case already cited, declared it to be the best evidence of a man's character that he is not talked about at all. The Supreme Court of Iowa, in *State* v. *Nelson* (58 Iowa, 208) declined to adopt this view, saying: " It cannot be fairly said that proof that one's neighbors have never heard his character canvassed is better proof of his

good reputation than proof that his neighbors generally speak in terms of commendation of his character. All that can properly be said of the kind of negative proof under consideration is that it is competent proof of good reputation and should be accepted and weighed by the jury." In this state-- ment of the law we agree.

Three conclusions are involved in our review of this case: *First,* that upon a criminal prosecution evidence is receivable in behalf of the accused that he has enjoyed a good reputation in respect to the traits involved in the charge against him; *second,* that evidence is not receivable in his behalf as to the existence of such traits when such evidence consists solely of the personal knowledge and observation of his conduct by witnesses and not of their knowledge as to his reputation in such respects; and *third,* that negative evidence is receivable to establish a good reputation. This statement may be of service as a guide to the solution of somewhat perplexing questions in this branch of the law of evidence which frequently arise upon criminal trials.

It follows from what has been said that the order of the Appellate Division reversing the conviction of the defendant must be affirmed.

CULLEN, Ch. J., GRAY, O'BRIEN, VANN, WERNER and CHASE, JJ., concur.

Order affirmed.