Wachtler, J.
On March 20, 1962 at a meeting of the Islip Town Board the appellant, Donald Kuss, a councilman and member of the town board, introduced and voted in favor of a resolution which changed the covenants and restrictions on a three-acre tract of land located at the intersection of Lakeland and Johnson Avenues in Sayville, New York.
Originally this parcel had been zoned “ residential ”, but in 1958 on application of the owner the major portion of the property had been rezoned “Business 1”. Although this general category allowed the construction of stores and apartment houses, the town board had imposed a restriction or covenant limiting the use of the property to a shopping center, which the owner intended to erect. The 1962 resolution changed this .restriction and permitted the construction of an apartment complex which immediately increased the value of the property.
The prime beneficiary of the board’s action was DWH Corp. which at the time the resolution was passed had a contract to purchase the property. This corporation was wholly owned by the appellant Walter Conlon and two brothers, Gilbert and Howard Roseman. Subsequently, in July, 1962 and May, 1964, two checks, one for $2,700, and another for $6,500, were issued by Howard Roseman Associates to Project Development Company, a corporation wholly owned by the appellant Donald Kuss.
In 1967 Kuss and Conlon were indicted for taking unlawful fees in violation of section 1826 of the former Penal Law. The People’s theory was that Kuss aided and abetted by Conlon, had sought and received nearly $10,000 from the members of DWH Corp. for introducing and voting in favor of the 1962 resolution.
The appellants did not testify at the trial. The evidence concerning the circumstances surrounding the resolution and fees *441 paid to Kuss came primarily from three witnesses; the two Bosemans and James Fallon, a Sayville attorney who had inadvertently brought the property into the limelight in 1962.
Fallon testified that he met with Kuss on February 19, 1962 on behalf of a client who was interested in having the restrictions changed so that he could purchase the property and erect an apartment house. Kuss informed him that the town board would never permit the property to be used in that manner.[1]
The Boseman brothers testified that in the latter part of February, 1962, Kuss contacted Conlon who informed them that the property was available as an apartment house site. The selling price was $43,000 and Kuss wanted a fee of $10,000 “ for bringing us this transaction ”. After Conlon arranged for the Bose-mans to examine the site and talk with Kuss personally, they agreed to acquire the property with Conlon under the name DWH Corp. When the Bosemans later learned from the owners, that contrary to Kuss’ representations, the property was not suitable for apartment houses, because of the existing covenants and restrictions, Conlon reassured them that the town board would allow the change as a routine matter. According to the terms of their oral agreement, Kuss was not entitled to any payments of his fee until they had ‘1 turned the property into cash” and as Gilbert Boseman testified at the trial “I couldn’t imagine him [Kuss] trying to hurt us ”.
DWH signed the contract of sale and shortly afterward, the town board, considering an application prepared by Conlon, and acting on Kuss ’ recommendation, voted to change the covenants and restrictions. In July, 1962 DWH sold the property to another corporation for $107,500.
From these circumstances, the jury could clearly find that Kuss had been paid the extraordinarily high fee[2] by DWH for his vote as a town board member on the resolution which more than doubled the value of the property. And since the proof showed that Conlon had communicated Kuss’ transaction to the *442 Rosemans, recommended its acceptance, reassured them that the change of covenants would be a routine matter, and encouraged payment of the requested fee, there was clearly sufficient evidence from which the jury could conclude that Conlon was acting throughout as an agent or intermediary for Kuss and was aiding or abetting him in the scheme for their mutual benefit. (People v. Morhouse, 21 N Y 2d 66.)
At the conclusion of the lengthy trial, the jury found the defendants guilty and they were subsequently sentenced to serve a term of one year’s imprisonment in the Suffolk County Jail. They are presently released pending appeal. The Appellate Division has unanimously affirmed the conviction of Kuss, and Conlon’s conviction was affirmed with one Justice dissenting.
The dissenter was troubled by Conlon’s claim that he had been denied a fair and impartial trial by virtue of improper cross-examination of his character witnesses combined with certain prejudicial remarks made by the prosecutor on summation. We have concluded that these alleged errors do not require reversal of the conviction.
At the trial Conlon called 12 character witnesses to testify as to his good reputation for honesty and integrity. On cross-examination, the District Attorney asked all but one of these witnesses if they had heard certain reports indicating that Conlon had committed two acts of misconduct while serving as Town Attorney for Islip Township during 1963 and 1964. Specifically he asked whether they had heard that Conlon had failed to disclose to the town board an interest he had (in a corporate name) in some land upon which the board granted permission to erect an outdoor movie on the same day it denied another corporation permission to build such a theatre on another piece of property located in the township. In the second question the witnesses were asked whether they had heard that Conlon had an undisclosed interest in some property (once again owned under a corporate name) which the town board wished to acquire for a parking lot; that he represented the town board in that acquisition and continued to represent both sides until the board learned of his interest in the site.
Both of these questions were allowed over objection, and the defendant Conlon claims this was error.
*443 Whether the defendant’s character will become an issue in the trial is the defendant’s option, for until he introduces evidence of good character the People are precluded from showing that it is otherwise. (People v. Sharp, 107 N. Y. 427.) And although character is the issue (i.e., the unlikelihood of the defendant’s committing the crime), reputation is the only proof which the law allows. (People v. Van Gaasbeck, 189 N. Y. 408.) Neither the defendant nor the prosecutor may introduce evidence of particular acts tending to prove or rebut the defendant’s good character.
But the rule is slightly different when it comes to cross-examination of the character witnesses. When their credibility is at issue, it is well established that they may be asked as to the existence of rumors or reports of particular acts allegedly committed by the defendant which are inconsistent with the reputation they have attributed to him. (Richardson, Evidence [9th ed.], § 157, p. 143.) However as the defendant indicates, there are certain limitations. The inquiry cannot be used to prove the truth of the rumors, but only to show the ability of the witness to accurately reflect the defendant’s reputation in the community. And the prosecutor must act in good faith; there must be some basis for his questions. (Michelson v. United States, 335 U. S. 469; People v. Alamo, 23 N Y 2d 630; see, also, Ann., Cross-Examination of character witness for accused with reference to particular acts or crimes, 47 ALR 2d 1258.)
The defendant’s first contention is that the court abused its discretion by permitting the District Attorney to ask the questions without preliminarily determining the source of his information. (See People v. Alamo, 23 N Y 2d 630, supra.) He suggests that if the inquiry had been made, the court would have discovered that the District Attorney was relying on certain newspaper reports made in 1967 and not on rumors circulating by word of mouth in the community, during the period alleged in the indictment.
Although it is not entirely clear from the record what the source of the prosecutor’s information was, it is significant that he offered on several occasions to demonstrate his good faith by revealing the basis of his questions. Since the defendant neglected to pursue this inquiry at the trial he should not be *444 heard to complain on appeal or to ask this court to speculate as to the exact nature of the prosecutor’s sources.
In any event the fact that the court permitted the prosecutor to question the character witnesses as to their awareness of certain newspaper reports reflecting on the defendant’s honesty and integrity, would not, in itself, constitute error.
While persuasive arguments could be made as to the doubtful reliability of certain newspaper reports, these same considerations would apply with equal force to unsubstantiated rumors carried by the ‘ ‘ grapevine ’ ’, and in the past, the courts of this State have recognized no distinction between the report and the rumor. (People v. Fay, 270 App. Div. 261, affd. 296 N. Y. 510, affd. 332 U. S. 261; People v. Jefferey, 82 Hun 409.) The relevant consideration after all is not the truth or falsity of the particular account, but rather “ the qualifications of the witness to bespeak the community opinion”. (Michelson v. United States, 335 U. S., at p. 483, supra.) To this end the prosecutor may inquire of the witness to see if he has heard of a particular event which was likely to result in some comment in the communty if not injury to the defendant’s reputation. “ This is permissible as bearing on the credibility of the witness, for if these rumors or reports had come to the witness’ attention, the value of his testimony as to the defendant’s good reputation may be seriously impaired ”. (Richardson, Evidence, supra, p. 143.)
The second contention in this regard is that the District Attorney abused his right to cross-examine by suggesting that the rumors had a solid basis in truth.
The comments complained of occurred when the prosecutor was called upon to inform the court as to whether there were rumors supporting his questions. He insisted on using the word “ report”; on one occasion stated that this was “ more than rumor even ”; and said that he would be acting in bad faith if he “ used a rumor ”. It was on these occasions that he offered to disclose the source of his information.
During these exchanges, the court advised the jury that ‘ ‘ these questions are put to the witness merely to test the accuracy of his knowledge of the reputation of Mr. Conlon. They are not offered here for the truth of these statements ”. This advisement was repeated twice during the course of the cross-examinations.
*445 There is no doubt that it would have been better practice to hold these discussions on the law out of the presence of the jury. Although defense counsel generally prompted these colloquies there was no request that they be held in the jury’s absence. Under these circumstances, the court’s instructions on the law, which were clearly proper, should be considered an adequate remedy. The only alternative would be to hold that comments of this nature are prejudicial per se requiring a mistrial or reversal of the conviction whenever they occur.
To adopt a rule of per se error in this anomalous and confusing area of the law would be ill advised. On this point we can hardly improve on the observations made by Mr. Justice Jackson in the leading case of Michelson v. United States (335 U. S., at p. 485, supra): “ limiting instructions on this subject are no more difficult to comprehend or apply than those upon various other subjects * * * A defendant in such a case is powerless to prevent his cause from being irretrievably obscured and confused; but, in cases such as the one before us, the law foreclosed this whole confounding line of inquiry, unless defendant thought the net advantage from opening it up would be with him. ’ ’
As to the improper remarks made during summation, there is no doubt that the prosecutor did on several occasions resort to name calling and made unwarranted attempts to appeal to the fears and excite the passions of the jury. As an experienced trial attorney he should have known that these efforts were improper and unnecessary.
A careful review of the record however reveals that for the most part, no objection was made and, therefore, the alleged errors were not preserved for our review. Where objection was properly made, the court’s disposition was appropriate. Considering all of these circumstances we have found that these overzealous remarks of the prosecutor do not require reversal of the convictions.
One other point which was not discussed by the court below deserves brief comment.
Kuss claims that he was denied his right of confrontation during the cross-examination of the Rosemans. The thrust of his argument is that the District Attorney was obligated to tran *446 scribe pretrial tape-recorded statements made by the Bosemans to law enforcement personnel.
In People v. Rosario (9 N Y 2d 286, 290) we decided as a matter of policy that a defendant was entitled to see or “ ‘ be given the benefit ’ of ” the pretrial statements of prosecution witnesses for the purpose of cross-examination. In our view the trial court fully complied with the Rosario mandate when it allowed an adjournment for more than a day in order to permit defense counsel to hear these tape-recorded statements in preparation for cross-examination. There is nothing in Rosario which imposes on the prosecutor the additional obligation of converting his work material into a form which would be most convenient for defense counsel at the trial. Nor is there any contrary authority in other jurisdictions which have adopted policies similar to Rosario (see Ann., Right of Defendant in Criminal Case to Inspection of Statement of Prosecution’s Witness for Purposes of Cross-Examination and Impeachment, 7 ALR 3d 181). Of course, if these recordings had been previously transcribed and were available at the time of the trial, we would agree that the defendant would have been entitled to use them on cross-examination.
We have considered the numerous other issues raised by the appellants and have found them to be without merit. The order appealed from should be affirmed.
Chief Judge Fuld and Judges Burke, Breitel, Jasen, Gtabrielli and Jones concur.
Order affirmed.

. As the representative from the Sayville area, Kuss’ approval was considered crucial, since as a matter of policy the other members of the town board generally deferred to the recommendation of the member in whose area the property was located.

. While the original fee to be paid was $10,000, Kuss was paid a total of $9,200.