STATE of Missouri, Respondent,

v.

Patrick E. TRIMBLE, Appellant.

No. 62523.

Supreme Court of Missouri,
En Banc.

Aug. 31, 1982.

Rehearing Denied Oct. 7, 1982.

728

Cynthia S. Holmes, St. Louis, for appellant.

John Ashcroft, Atty. Gen., John M. Morris, Asst. Atty. Gen., Jefferson City, for respondent.

MORGAN, Judge.

The appellant, Patrick E. Trimble, was tried to a jury which found him guilty of capital murder and assessed his punishment at death. Secs. 565.001, 565.008 and 565.-012, RSMo 1978. Judgment was entered accordingly and he has appealed to this Court which has exclusive appellate jurisdiction by reason of Section 3 of Article V of the Constitution of Missouri. Having

reviewed and considered all errors enumerated by way of appeal and the sentence as mandated by § 565.014, RSMo 1978, the same is affirmed.

At the trial, evidence was presented from which the jury could find the following facts beyond a reasonable doubt:

The victim, Jerry James Everett, a white male, twenty years of age, had been arrested on charges of stealing a van and placed in the St. Charles County jail around October 28, 1979. Appellant, also a twenty year old white male, arrived approximately two days later to await disposition of charges of kidnapping, raping and sodomizing two nine year old girls.

The evidence shows that appellant was dissatisfied with the prospect of serving time under the pending charges because he believed that penitentiary inmates have little use for those "up" on such charges and would make life difficult and dangerous for him. He stated, to three different inmates of the St. Charles County Jail, that he intended to "catch something bigger" and would commit a "capital murder," killing either another inmate or a guard.

Sometime during the week or so before November 12, 1979, appellant, who weighed approximately 210 lbs. and was 6'1" tall, settled upon Jerry Everett, who weighed approximately 145 lbs. and was 5'10" tall, as his victim. The evidence shows that Everett was mentally slow and may never have fully comprehended what was happening to him. Several inmates observed that he was mentally slow, and his mother testified that he had had some drug problems, had run away from home on numerous occasions, had begun to withdraw at around age 16, had become a loner and had received inpatient counseling in a hospital in Memphis, Tennessee. She also stated that he had difficulty writing and that it was unlikely that he knew his jail address. She had even had to send him the address for the home where he had lived.

On numerous occasions, appellant, with the jail's other inmates, took Everett's food after winning it in card games that the victim did not understand and could not

play competently. Appellant placed burning matches between his victim's toes while he slept and at one point burned what appeared to be letters into Everett's right forearm by using a burning plastic shampoo bottle to administer this torture. Expert testimony indicated that these burns were *one half inch deep* at the autopsy.

The evidence showed that appellant treated the victim as his "punk" or homosexual partner. He forced the victim to have both oral and anal intercourse with him, compelled him to wear a "bra" around the jail for the entertainment of the other inmates, and forced him at one point to display to the other inmates a rag that had been stuffed into his anus. Appellant made his victim offer kisses to the other inmates and offered to sell him to a jail trustee for a carton of cigarettes. He completed this pattern of torture and homosexual abuse by repeated beatings and by compelling Everett to sweep and mop the four jail cells in the block on several different occasions, following Everett around while he worked and beating him with his fists when he failed to comply.

On Sunday, November 11, appellant told Kenneth Schwab and John Rice that he intended to kill Everett to keep him from informing the authorities, when he went to court on November 13, of the sexual abuse he had suffered. This motive appears to have superseded his earlier motive because appellant devised a scheme to hide his crime rather than publish it to the penitentiary society. The day before the killing, he compelled Everett to write a suicide note to his parents, explaining that he could not live away from them and telling them not to cry for him because he had accepted the Lord into his life. The evidence showed that the victim was quite religious, having accepted Jesus into his life years before; that he spent much of his time in jail reading the Bible; and, that appellant had initially maneuvered himself into the victim's confidence by representing himself as a minister. The note was written on paper and placed in an addressed and stamped envelope, both of which the victim's mother had given him.

Appellant dictated its contents after telling Donald Hill he was going to have Everett write a suicide note.

Appellant further prepared for the slaying by tying strips of towels together and had one of the inmates assist him in testing their strength. Shortly after dinner on November 12, 1979, appellant took Everett to Everett's cell and there placed a blanket around him, which he described as Everett's "dress." He told his victim that they were going to play the "hangman's game." Appellant compelled Everett to sit in front of him on the floor while appellant sat on one of the bunks with Everett's back and head braced against appellant's knees. Appellant placed a towel in his victim's mouth; and then, in the course of fifteen to twenty minutes, he strangled Everett by twisting a towel around his neck. At some point, Everett's neck was fractured. Appellant made the remark to one inmate that it took a very long time to kill Everett.

Several inmates testified in addition to the above facts that they saw appellant trying to lift Everett's body up to where appellant had tied a strip of towel on the upper bars of the cell. None, however, ever observed Everett hanging from this towel.

Shortly after the strangulation, appellant called the inmates to his cell and told them that his plan was to make the death look like a suicide and that they were to say they were all watching t.v. when it occurred. He told them that he had connections on the outside and indicated that he would have them killed if they told on him. He then returned to Everett's cell and directed one of the inmates, John Rice, to call the guards. When they arrived, they observed appellant removing a towel from Everett's neck and appellant and Alvin Tate, who was Everett's cell mate, lifting Everett's body into the hallway. The guards ordered the inmates into their cells and unsuccessfully attempted to revive Everett. Initially, the inmates told the authorities that they had been watching t.v. and thought Everett had committed suicide. Later, however, a total of nine inmates made statements to the police investigators establishing the above facts: three who heard appellant express his intention to commit a "capital murder" to avoid going up on charges of raping, sodomizing and kidnapping children and who were released from the jail a week before the slaying; and six who were eyewitnesses to the torture, sexual abuse and strangulation.

## POINT I

Appellant contends, in his first point, that the trial court erred in overruling his motion for a new trial and sentencing him to death because the jury conducted itself improperly in that its verdict that appellant should receive the death penalty was not clearly based upon a finding of a statutory aggravating circumstance.

At the trial, after the jury had returned a guilty verdict on the charge of capital murder, the court instructed the jury that it could assess the death penalty if it found either of two aggravating circumstances: (1) that at the time of the murder of Jerry James Everett the defendant was in the lawful custody of a place of confinement; or (2) that the murder of Jerry James Everett was committed for the purpose of avoiding a lawful arrest of defendant. The jury returned the following verdict on punishment:

"We, the jury, having found the defendant Patrick E. Trimble guilty of the capital murder of Jerry James Everett, fix the defendant's punishment at death, and we designate the following aggravating circumstance or circumstances which we find beyond a reasonable doubt: that at the time of the murder of Jerry James Everett the defendant was in the lawful custody of a place of confinement and as a deterrent to further acts of violents [sic]." This verdict was returned at 10:14 p. m. At 10:06 p. m., the jury had sent a note to the court with the following inquiry: "The jury would like to know, if all we have to put on the verdict form is 'that at the time of the murder of Jerry Everett the defendant was in the lawful custody of a place of confinement.' We are referring to the form for the death penalty. Or do we have to go

into lengthy detail." The court sent the following answer at 10:10 p. m.: "I have received your communication. I cannot make any comment or further instructions to you. I can only refer you to the instructions which you already have with you."

The question presented is whether the jury based its verdict upon a statutory aggravating circumstance or whether it exceeded the bounds of its discretion and based its verdict upon a rationale of its own devising. Appellant contends that the verdict is ambiguous on its face and that it is unclear whether the jury would have assessed the death penalty upon a finding of the designated statutory aggravating circumstance alone. He argues that this court is unable to review the action of the jury and must, therefore, find that it has acted in an arbitrary and capricious manner. We disagree.

■ Requiring that the jury find a statutory aggravating circumstance is designed to prevent the arbitrary and capricious imposition of death sentences. Finding a statutory aggravating circumstance, however, is only a *threshold requirement* that must be met before the jury can, *after considering all the evidence,* recommend the death sentence. *State v. Bolder,* 635 S.W.2d 673 at 683 (Emphasis added) (Mo. 1982). The statutory aggravating circumstance is to channel the jury's discretion. The jury in the instant case affirmed the presence of the one aggravating circumstance specified in its verdict, and the evidence supports that finding. *Cf. State v. Mercer,* 618 S.W.2d 1, 10, n.5 (Mo.banc 1981) and *State v. Robert Baker,* 636 S.W.2d 902 (Mo.banc 1982). In addition thereto, the jury added the words ". . . as a deterrent to further acts of violents [sic]." On reflection thereof, we do not find such action indicative of any arbitrary or capricious conduct and rule the same to be merely harmless surplusage. In passing, we do note that "deterrence" historically has been a permissible consideration whenever appropriate punishments for crimes have been the issue.

## POINT II

Appellant argues that the trial court erred in refusing his motion for a mistrial when the prosecutor referred to appellant's having been charged with rape and kidnapping in his opening and closing statements and in his examination of witnesses. He contends that the prejudicial quality of this evidence outweighed its probative value as to motive and that the trial court abused its discretion because the state had other available evidence equally probative of motive.

■ A criminal defendant has the right to be tried only for the crime or crimes with which he is charged, and the admission of evidence of *unrelated* crimes is prejudicial because it may result in a conviction founded upon crimes of which the defendant was not accused. Thus, evidence of *other* crimes is admissible only where it has a legitimate tendency to establish that the defendant is guilty of the immediate crime charged. Evidence thereof is admissible where it tends to establish motive, intent, the absence of mistake or accident, a common scheme or plan embracing the commission of two or more crimes so related that proof of one tends to establish the other, or the identity of the person charged with the commission of the crime on trial.

■ Appellant's argument that prejudicial albeit relevant evidence should be excluded was raised in *State v. Shaw,* 636 S.W.2d 667 (Mo.banc 1982), and there we stated that relevance, not prejudice, is the touchstone of due process and that the question of whether the prejudicial effect of evidence outweighs its probative value rests within the sound discretion of the trial court. *Id.* at 672. We do not find that the trial court abused its discretion. Here the evidence was highly probative of material elements of the crime of capital murder, namely deliberation and premeditation; and it was probative of appellant's motive for the crime. At least ten days before the slaying, appellant had formed the intent to commit a "capital murder." Who his victim was did not particularly concern him be-

cause his motive was simply to earn the respect and fear of his prison peers and to cover the stain of having sexually abused little girls. The evidence of the prior crimes brings into sharp focus appellant's intent by illuminating his motive. This court notes, moreover, that the trial court refused to allow the state to argue the specific offenses to the jury in closing argument and instructed it to disregard the state's references to the specific crimes. While we will not say the trial court would have abused its discretion had it ruled otherwise, we do note that the trial court's conduct probably lessened whatever inflammatory impact the evidence may have had upon the jury. We find that the evidence was relevant to intent and motive and that the trial court did not abuse its sound discretion in the manner in which it allowed the jury to receive the same.

## POINT III

Appellant next contends that the trial court erred in instructing the jury that it could find as an aggravating circumstance that the capital murder had occurred while appellant was in the lawful custody of a place of confinement because the state had presented no evidence that the custody was lawful. Appellant argues that the state must prove beyond a reasonable doubt that his initial arrest and custody were lawful, *e.g.*, that there was probable cause for his arrest. We disagree.

The meaning of "lawful custody" in § 565.012.2(9), RSMo 1978, has not been construed. Therefore, we hold that this phrase means "custody under color of law," that is, in the custody of a lawful authority. The adjective "lawful" takes as its definiendum the *authority* enforcing the confinement and not the *custody*. We agree with the state that the statute impliedly distinguishes between custody by a lawful authority and confinement by a legally unauthorized person or entity. The reasons are threefold:

First, the contrary construction would not square with other statutes and the earlier pronouncements of this court that construe

those statutes. This court has recently noted in construing § 575.150.3, RSMo 1978, that it is no defense to prosecution for wounding an officer while he is actively engaged in performing his lawful duties that the arrest was without probable cause, *State v. Thomas,* 625 S.W.2d 115, 121 (Mo. 1981); nor is it a defense that the law that a defendant was arrested for violating was unconstitutional. *Id.* It is no defense to the crimes of escape or resisting arrest that the confinement was illegal. *State v. Croney,* 425 S.W.2d 65, 68 (Mo.1968). §§ 575.-150.3 and 575.210, RSMo 1978. *State v. Croney* held that: "where the imprisonment is under color of law, the prisoner is not entitled to resort to self-help but must apply for his release through regular legal channels." *State v. Thomas, supra,* at 122, held that because a defendant has no right to resist an unlawful arrest by a *known* police officer, his resistance cannot be condoned by reducing the degree of the resulting offense. Clearly, it would be no defense to capital murder that the defendant was incarcerated unlawfully; and, it would be inconsistent with the policies and reasons underlying the above cited cases and statutes now to hold that the aggravating circumstance of a capital murder in a place of lawful confinement is negated where the underlying arrest, for example, was not lawful.

Second, a distinction between custody by a lawful authority and confinement by a legally unauthorized person is consistent with basic tort law and serves a legitimate state purpose. Where one is confined by a legally unauthorized person, one has the right of self-defense. However, one does not have the right of self-defense where custody is by a lawful authority unless the authority uses unlawful force. The policy underlying the distinction is that underlying the statutory aggravating circumstances to protect the authorities who are lawfully appointed to administrate and guard penal facilities. *State v. Bolder, supra,* at 683; *State v. Shaw, supra,* at 674.

Third, to hold to the contrary would be to render the death penalty flowing from this

aggravating circumstance arbitrary and capricious because the penalty given would depend not upon the defendant's conduct or circumstances under his control, but, rather, upon the conduct of the police in making an illegal arrest or of the legislature in enacting a bad law.

■ We hold that the state was required to show only that the custody was under color of law and that the evidence presented was sufficient to support a finding beyond a reasonable doubt that appellant committed a capital murder while in the lawful custody of a place of confinement.

## POINT IV

■ Appellant next argues that the judgment must be reversed and the case remanded because the state argued punishment in closing argument before the jury had determined guilt. This argument is raised for the first time on appeal—indeed, the alleged error was invited at the trial—and must be reviewed under the plain error rule, Rule 29.12(b); and "alleged errors on closing argument do not justify relief under [the plain error rule] unless they are determined to have a decisive effect on the jury." *State v. Murphy,* 592 S.W.2d 727, 732 (Mo.banc 1979).

Section 565.006, RSMo 1978, states that "[a]t the conclusion of all trials upon an indictment or information for capital murder heard by a jury, and after argument of counsel and proper charge from the court, the jury shall retire to consider a verdict of guilty or not guilty without any consideration of punishment." MAI–CR 15.00 Supplemental Notes on Use state that "[i]f capital murder is submitted to the jury, the punishment for that offense and for any lesser included offense submitted therewith must be omitted, even though the death penalty for capital murder has been waived."

■ Clearly, it would have been error for the court to have instructed the jury on punishment in the guilt phase of the trial. The court, however, did not instruct on punishment, and so appellant's argument is really only an allegation that the court did not exercise adequate control of the arguments. The trial court has considerable discretion in allowing or rejecting argument of counsel, and its rulings are reversible only for abuse of discretion where argument is plainly unwarranted. *State v. Moore,* 620 S.W.2d 370 (Mo.1981). Moreover, appellant must show that the abuse of that discretion prejudiced him. *State v. Wood,* 596 S.W.2d 394 (Mo.banc 1980), *cert. denied,* 449 U.S. 876, 101 S.Ct. 221, 66 L.Ed.2d 98 (1981).

■ Appellant's trial counsel indicated to the court his intention to describe the penalties in his closing argument before the jury determined guilt. In light of this court's statements in *State v. Holt,* 592 S.W.2d 759, 764 (Mo.banc 1980), that a jury may properly consider punishment in choosing to convict on second degree murder rather than capital murder, appellant's request at trial was not unreasonable and the trial court did not abuse its discretion in acceding to this request. Appellant cannot now be heard to complain that the prosecutor described the penalties. That appellant's trial counsel did not actually avail himself of the opportunity is of no moment because the prosecutor could not know that appellant would state in the instruction conference that he would so argue and then not argue the point after the state had.[1]

■ We note, finally, upon review of the whole record that the state did not "argue" punishment. It restricted itself to a simple, declarative statement of the penalties for each degree of homicide charged. In all, the court did not abuse its discretion in acceding to the reasonable demands of counsel, and the state's argument did not prejudice appellant. Therefore, the point is denied.

---

1. We here neither hold nor imply that the state can introduce the issue of punishment into the guilt phase of the trial where a defendant has not. *State v. Holt* is not a two edged sword that may be used generally to break down the bifurcated structure of a capital murder trial.

## POINT V

Appellant next alleges that the trial court erred in failing to strike the state's notice of evidence of aggravating circumstances because it did not give him adequate notice or opportunity to prepare. Specifically, appellant contends that a disclosure of aggravating circumstances must comply with Rule 23.01 and provide a defendant with notice of the aggravating circumstance, the specific evidence supporting that circumstance and the names and addresses of all material witnesses. We disagree.

Section 565.006.2, RSMo 1978, states that "[o]nly such evidence in aggravation as the prosecution has made known to the defendant prior to his trial shall be admissible." The statute does not state or suggest that something on the order of a separate indictment or information is required. We decline the invitation to read useless requirements into the statute. Under Rule 23.01, defendants currently receive specific notice of the crimes for which they are charged, facts constituting the offense and the time and place of the offense. Additionally, they receive notice of what witnesses will testify against them. We believe that notice of the aggravating circumstances that goes no further than the language of the statute is sufficient where the information states facts sufficient to give notice of the crime charged and contains the names of all witnesses from whom may be discovered the evidence of the aggravating circumstances. Such notice is all the process that is due even where the death penalty may be imposed. Here appellant received notice of the aggravating circumstances on June 23, 1980, a month before trial, and received the Information on January 29, 1980. Together, the notice of aggravating circumstances and the Information were sufficient notice.

## POINT VI

Appellant next contends that the trial court erred in permitting three police officers to testify as to the reputation of the appellant for veracity and truthfulness. He also contends that even if such testimony was proper, it was error not to strike the witnesses' volunteered opinions as to his veracity. Since these issues are first raised on appeal, we will review them only as plain error under Rule 29.12(b). We find no error.

When a witness takes the stand, he places his reputation for truthfulness and veracity in issue and the state may then offer evidence of his general reputation for truthfulness and veracity. *State v. Brookshire,* 368 S.W.2d 373, 385 (Mo.1963). Here, appellant had testified in his own behalf, and the court did not err "plainly" or otherwise in permitting the witnesses to testify as to appellant's reputation for veracity and truthfulness.

Generally, a witness should not testify as to his opinion of the accused's character. *State v. Antwine,* 506 S.W.2d 397, 399 (Mo.1974). Federal Rule 405, however, permits such evidence, and opinion evidence on veracity and truthfulness cannot be said generally to violate due process. The classic rationale of the reputation-only rule was stated in *People v. Van Gaasbeck,* 189 N.Y. 408, 82 N.E. 718 (1907); classic because it is the oft quoted answer to Wigmore's argument for the admissibility of opinion evidence of character. 7 Wigmore, Evidence § 1986 (3d ed., 1940). The thrust of *Van Gaasbeck* was that permitting opinion evidence would lead to endless inquiries into the basis of opinions and innumerable collateral disputes. This is not a due process concern except insofar as a defendant is denied due process when a jury becomes confused by collateral issues. In the case at bar, no confusion of constitutional magnitude resulted because the state itself put a stop to the witnesses' attempts to express their opinions. Thus, we cannot say that appellant suffered manifest injustice when the court did not strike the witnesses' testimony *sua sponte,* and the point is denied.

## POINT VII

Appellant next contends that the trial court erred in not striking on its own motion the testimony of the victim's mother

because it was not relevant and was inflammatory. Again, we will review this issue under the plain error rule, Rule 29.12(b), because appellant raised it on appeal for the first time. We find no error.

At the trial, appellant placed the victim's mental state in issue, testifying that he discovered Everett hanging by the neck from the bars. Additionally, a suicide note was discovered on Everett's bunk, and the state's witnesses testified that appellant stated that he would have Everett write a suicide note and that they saw him dictating to Everett as Everett wrote. The note was as follows and was placed in a stamped envelope with return address:

"Dear Mom and Dad

I'm sorry to have to send this letter but, I can't handle the pressure of being away from You and Dad. I know I've caused you both a lot of sorry and pain. So I fell its best this way. I love you both very much, and please don't cry, because I have accepted the Lord into my life, and I know I will, go to heaven, remember me always

Your Son

Jerry Everett [sic]"

The victim's mother testified that her son had been a Christian for years and had not been converted recently as the note suggested. She stated that he had had some personal problems: he had the mental age of 12 or 13; he was a loner, having begun to withdraw at about age 16; he had had some drug problems. She testified that he had recently received counseling and appeared to be improving; that the family had recently been fishing in Canada and was planning a sailboat trip when Jerry was arrested; and, that he had enjoyed and was looking forward to these trips. Finally, the witness testified that the letter did not seem authentic because Jerry's spelling and composition were normally poor, he did not ever sign his mail, he would not know his return address and he had not lived with his parents for some time.

■■■ Questions of relevancy are left to the discretion of the trial court and its ruling will be disturbed only if an abuse of discretion is shown. *State v. Wood,* 596 S.W.2d 394, 402 (Mo.banc 1980). Whether potentially prejudicial or inflammatory evidence is admitted is within the trial court's discretion, and relevancy is the principal criterion. *Id.* at 403. Our review of the record does not show that the trial court abused its discretion, and the point is denied.

## POINT VIII

In his final point, appellant levels several constitutional attacks upon §§ 565.001, 565.003, 565.006, 565.008 and 565.016, RSMo 1978. Specifically, he contends that the imposition of the death penalty is arbitrary and capricious because (1) the prosecutor has discretion to charge capital murder in a particular case; (2) the jury has unbridled discretion because it can find a defendant not guilty of capital murder and guilty of a lesser included offense; (3) the mechanism by which the court can compare homicides committed in a jail or other penal institution is inadequate; (4) the imposition of the death penalty in this case does not implement a legitimate state interest; and (5) the death penalty has not been shown to be a deterrent. Finally, appellant argues that the statutes are vague and overbroad and violate the Equal Protection Clause.

### A.

■■■ That the prosecutor has discretion in charging capital murder does not render the death penalty arbitrary and capricious, *Gregg v. Georgia,* 428 U.S. 153, 199, 96 S.Ct. 2909, 2937, 49 L.Ed.2d 859 (1976), nor does the jury's discretion to acquit a defendant of capital murder and convict him of a lesser included offense. In *Gregg,* the United States Supreme Court stated:

The existence of these discretionary stages is not determinative of the issues before us. At each of these stages an actor in the criminal justice system makes a decision which may remove a defendant from consideration as a candidate for the death penalty. *Furman,* in contrast, dealt with the decision to im-

pose the death sentence on a specific individual who had been convicted of a capital offense.

 Discretionary acts before the sentencing phase are irrelevant to whether the death penalty is arbitrary and capricious. Only discretionary acts that concern punishment and that occur after conviction for capital murder are relevant to this issue. Thus, the prosecutor's discretion to prosecute and the jury's discretion to acquit of capital murder are irrelevant. Similarly, the mechanism by which this court compares capital murders committed in jails or other penal institutions need not include "cases such as those in which the state chose not to charge a defendant with capital murder, the state agreed to a plea bargain whereby a defendant pled guilty to a lesser charge, the conviction was for an offense less than capital murder, or the state waived the death penalty." *State v. Bolder, supra,* at 685. And, thus, the mechanism by which this court will compare appellant's case to other capital murder cases in Missouri is adequate although it does not compare capital murder cases with lesser degrees of homicide or with cases where no charges were brought and does not compare the treatment of defendants at the charging and plea bargaining stages.

### B.

 *State v. Bolder, supra,* at 683, stated that the legislature, in adopting § 565.-012.2(9), RSMo 1978, reasonably could have concluded that the death penalty is appropriate "when imprisonment already imposed does not deter capital murder. The imposition of capital punishment is rationally related to the state's obviously legitimate interests in preventing crime and protecting other persons, such as prison employees and other inmates, with whom prisoners come in contact." Appellant argues that because he had not been convicted and was merely awaiting trial when he committed the capital murder, the legitimate purposes of the statute would not be served by imposing the death penalty. The legitimate state purpose expressed in the statute is not

merely to deter capital murder in prisons where imprisonment may not, but to deter them in every case. It is not a condition precedent to the death penalty for capital murder with the aggravating circumstance that the killing was in a prison that the defendant previously had been given a life sentence. That this court has found, employing a rational basis test (see *Bolder, supra,* at 682) that the legislature legitimately could have considered those instances where imprisonment was not an adequate deterrent does not foreclose our finding, under a rational basis test, that the legislature legitimately could have ·aimed this aggravating circumstance at deterring all capital murders in any prison. The legislature may have had several reasons: deterring those otherwise undeterred; protecting prison guards who daily serve the state in a dangerous environment; and protecting other prison inmates who are relatively defenseless in the prison environment. In *State v. Shaw, supra,* at 677, we said that "[t]hose imprisoned for violating our laws have cast upon the state both the expense of, and the responsibility for, their safe care while in confinement."

### C.

 Appellant argues that the death penalty has not been shown to be a deterrent and, therefore, is cruel and unusual punishment. This question was raised and disposed of in *Gregg v. Georgia, supra,* at 183–88. The legislature rationally could determine that the death penalty is a deterrent. Moreover, the death penalty has other legitimate purposes, namely, incapacitation and retribution.

### D.

Appellant argues, finally, that the statutes are vague and overbroad and violate Equal Protection. He offers no reason for sustaining this claim, and we see no reason to reconsider our previous holdings in *State v. Newlon,* 627 S.W.2d 606, 162–13 (Mo.banc 1982), *petition for cert. filed,* (U.S. May 5, 1982) (No. 816660), and *State v. Bolder, supra,* at *et seq.,* which held that the aggra-

vating circumstance for which appellant was sentenced to death does not violate the Equal Protection Clause. The point is denied.

## POINT IX

Section 565.014.1 mandates that we review the death sentence where it is imposed. Section 565.014.3 provides:

With regard to the sentence, the supreme court shall determine:

(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; and·

(2) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in section 565.012; and

(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

Our review of the entire record convinces us that the sentence was not imposed under the influence of passion, prejudice or any other arbitrary factor.

■ Section 565.012.2(9), RSMo 1978, provides as a statutory aggravating circumstance that "[t]he capital murder was committed by a person in . . . the lawful custody of a . . . place of lawful confinement." The jury so found, and the evidence supports its findings.

■ Our final consideration is whether the death penalty, taking into account both the crime and the defendant, is excessive or disproportionate to the penalty imposed in similar cases. Since the enactment of our current capital murder statute, § 565.001, this Court has reviewed and affirmed four death sentences. *State v. Shaw,* 636 S.W.2d 667 (Mo.banc 1982);[2] *State v. Bolder,* 635 S.W.2d 673 (Mo.banc 1982); *State v. Newlon,* 627 S.W.2d 606 (Mo.banc 1982), *petition for cert. filed,* (U.S. May 5,

1982) (No. 81–6660); *State v. Mercer,* 618 S.W.2d 1 (Mo.banc), *cert. denied,* 454 U.S. 933, 102 S.Ct. 432, 70 L.Ed.2d 240 (1981). We have reversed one death sentence because of its disproportionality. *State v. McIlvoy,* 629 S.W.2d 333 (Mo.banc 1982). In addition to *Shaw, Bolder, Newlon,* and *Mercer,* we have affirmed twelve capital cases in which the choice of death or life imprisonment without possibility of parole for fifty years was submitted to the jury. *State v. Greathouse,* 627 S.W.2d 592 (Mo. 1982); *State v. Bostic,* 625 S.W.2d 128 (Mo. 1981); *State v. Thomas,* 625 S.W.2d 115 (Mo.1981); *State v. Emerson,* 623 S.W.2d 252 (Mo.1981); *State v. Turner,* 623 S.W.2d 4 (Mo.banc 1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 1982, 72 L.Ed.2d 448 (1982); *State v. Jensen,* 621 S.W.2d 263 (Mo.1981); *State v. Baskerville,* 616 S.W.2d 839 (Mo. 1981); *State v. Mitchell,* 611 S.W.2d 223 (Mo.banc 1981); *State v. Williams,* 611 S.W.2d 26 (Mo.banc 1981); *State v. Royal,* 610 S.W.2d 946 (Mo.banc 1981); *State v. Borden,* 605 S.W.2d 88 (Mo.banc 1980); *State v. Downs,* 593 S.W.2d 535 (Mo.1980).

We have decided two cases in which the statutory aggravating circumstance was that the capital murder was committed by a person in the lawful custody of a place of lawful confinement. In *State v. Shaw, supra,* the defendant killed a corrections employee engaged in the performance of his official duty. In *State v. Bolder, supra,* as here, the defendant killed another inmate. We find that in exercising its discretion to impose the death penalty after finding the existence of the aggravating circumstance, the jury did not impose a sentence that was excessive or disproportionate.

It is a rare case where a defendant announces his intent to commit a "capital murder" by slaying either a guard or another inmate a week before he does so. It is rare for a defendant to commit a capital murder in order merely to rise in the estimation of his criminal peers with no particular preference as to victim. It is unparal-

---

**2.** We have solicited the cases below, which we have again surveyed, from *State v. Shaw, su-* *pra.*

leled that after announcing these aspirations to other inmates that a defendant should set about a week long starving, beating, burning and sexual abuse of an inmate much smaller in size than he and especially vulnerable because of age, experience and mental deficiency. The evidence shows that appellant slew his victim in the confines of a prison in the manner of an execution, and this court finds that the death penalty for appellant is neither disproportionate nor excessive.

Finding no reversible error, the judgment should be and is hereby affirmed.

DONNELLY, C. J., and RENDLEN, WELLIVER, HIGGINS and BARDGETT, JJ., concur.

SEILER, J., concurs in result in separate opinion filed.

Execution date re-set for October 28, 1982.

SEILER, Judge, concurring in result.

While I doubt that the death penalty does more good than it does harm, my personal views are not important and under compulsion of the previous cases wherein this court has upheld the death penalty, I concur in the outcome of the present case.

Something should be said about the appalling lack of supervision in the St. Charles County jail which this case brings to light. One cannot read what happened to the victim without wondering how the abuse could have gone unnoticed or undiscovered by the sheriff, who is by law in charge of the jail, § 221.020, RSMo 1978, or his deputies or jailers. The abuse went on for over a week prior to the actual killing. Evidently there is no supervision whatever exercised in St. Charles County over the jail and the prisoners are free to run wild and do as they please with one another. Those who are supposed to be in charge of the jail look the other way or designate an inmate trusty as jailer, a system which leads to deplorable abuses.

What was permitted to take place in the St. Charles County jail is a public disgrace. The principal opinion speaks about the state having the responsibility for the safe care of those in confinement. That responsibility obviously means nothing in the St. Charles County jail. "All hope abandon, ye who enter here" would be a fitting inscription for its portals, just as over the gates of Dante's Hell.