STATE of Missouri, Respondent,

v.

Clarence STARR, Appellant.

No. 57343.

Supreme Court of Missouri,
En Banc.

April 9, 1973.

———◆———

John C. Danforth, Atty. Gen., Gene E. Voigts, First Asst. Atty. Gen., Jefferson City, for respondent.

Charles P. Todt, Clayton, Bernard A. Ruthmeyer, Jr., St. Louis, Martin E. Juncker, Clayton, for appellant.

BARDGETT, Judge.

Defendant-appellant Clarence Starr was convicted of murder in the first degree and the death sentence was imposed by a jury. The motion for new trial was overruled and this appeal followed. Notice of appeal was filed October 5, 1971. This court has jurisdiction. Art. V, § 31(4), Mo.Const. 1945, as amended.

On Wednesday, October 29, 1969, at about 11:30 p.m., the Belt Loop Liquor Store at 5501 St. Louis Avenue, St. Louis, Missouri, was robbed and Mr. Preston Rankin, the owner, was shot and killed. One customer testified that he was in the store at the time but could not identify the robbers because his coat was thrown over his head by one of them. One of the robbers put a pistol to the customer's head and said it was a stick up. The customer heard some mumbling, scuffling and two or three shots fired. Another witness testified he went into the store shortly after 11:30 p.m., saw the customer on the floor with a coat over his head, saw that Mr. Rankin had been shot and was slumped against the cash register and called the police. The cash register drawer was open; Rankin was unconscious and never made any statements.

Officers Bohlan, Keplinger and Thomas went to the scene. The body of Mr. Rankin was removed to Homer G. Phillips Hospital where he was pronounced dead and taken to the city morgue.

Detectives Anton, Mueller and Mancuso arrived at the scene about 12:10 a.m., October 30, 1969. The body had been removed from the scene. Detective Mueller testified he found some quarters strewn about the floor and two ten-dollar bills on a desk, but no other money. He saw money orders sticking out of a desk drawer and in checking further ascertained that about 140 money orders were missing. Mueller viewed the corpse in the morgue and observed three puncture wounds, apparently gunshot wounds, in the neck and back.

Mrs. Rankin testified she turned money order receipts and the cash register tape for October 29, 1969, over to Detective James Dowd. The cash register tape had "October 29, 1969, A.M., Wednesday morning" written on it in the handwriting of the deceased. The money order receipts were for money orders sold on October 29, 1969.

Det. Dowd testified that the cash register tape for October 29, 1969, totaled $353.55. The total amount of money orders sold on October 29, 1969, at the store was $273.28. The total amount of cash on hand in the store was $626.83.

The next day, October 30, 1969, Barbara Lakes tried to cash one of the money orders at a drugstore and she was subsequently arrested and the money order

seized. When the police went to the Lakes apartment they saw burned ashes on the gas stove. The ashes were identified by an expert as being the remains of other money orders that came from Belt Loop Liquor Store.

Barbara Lakes lived with James Goodlow at 4257 Enright. About 8:00 a.m. on Thursday, October 30, 1969, Goodlow gave Lakes two money orders and told her to cash them. After unsuccessfully attempting to cash them, Lakes was stopped by the police and gave the two money orders to them. Goodlow was in the apartment when Lakes left with the money orders.

Goodlow testified that he had a conversation with defendant and one Acy Haynes about 10:30 p.m. on October 29, 1969, at the Moonlight Lounge. The defendant asked Goodlow for the use of Goodlow's car and told him they wanted to use it to stick up Mr. Rankin's liquor store. Goodlow told the defendant he had sold his car and then defendant said they would take a cab. The three, defendant, Haynes, and Goodlow, took a cab to 4257 Enright where Goodlow lived and he changed clothes and got back in the cab. Haynes also went into the apartment building, but not to Goodlow's apartment, and returned to the cab with a shotgun and a revolver. Haynes handed the revolver to Starr. Goodlow got out of the cab at St. Louis and Arlington, and Starr told Goodlow that if he (Starr) was not back at the Moonlight Lounge in twenty minutes Goodlow should tell a Mrs. Harris, the mother of Starr's girl friend, to go out to Rankin's liquor store. Goodlow returned to the Moonlight Lounge and told Mrs. Harris what Starr said. Goodlow, Mrs. Harris, and others then drove to the Belt Loop Liquor Store. Mrs. Harris went into the store, then returned to the car and told them Mr. Rankin had been shot. They returned to the Moonlight Lounge. Starr and Haynes were already there. Starr told Goodlow he had some money orders and asked Goodlow if he wanted some of them,

and Goodlow said yes. Starr also told Goodlow, "he had to shoot the dude". Starr told Goodlow that he would bring the money orders to Goodlow because Starr's mother didn't want people coming into their house. Goodlow walked home and waited. Starr and Haynes came there shortly and Starr gave Goodlow eight money orders and left. Goodlow went into his apartment, filled out two of the money orders making them payable to Barbara Lakes, and went to bed. Goodlow identified the two money orders subsequently taken from Lakes by the police as being the two he filled out and gave to Lakes. Sometime after Barbara Lakes left to cash the money orders, Starr came to Goodlow's apartment and told Goodlow not to cash the money orders because "the fellow had died and they was hot." Goodlow and Starr went into Goodlow's apartment and burned the remaining money orders on the gas stove. Later Goodlow and Starr went to Acy Haynes' house where Starr told Haynes to burn all of the other money orders.

Later that day Goodlow was arrested and in October 1969 was charged with murder, robbery with a dangerous and deadly weapon, and attempted robbery, as a result of the robbery and death of Preston Rankin. The jury was told that the charges against Goodlow were dismissed by the state on the morning Goodlow testified in this case. Goodlow remained in jail from October 30, 1969, to the date he testified, March 18, 1971. Defendant's attorney asked Goodlow on cross-examination where he had been since October 1969. The state objected to the question as being irrelevant and immaterial to the issues in the case and the court sustained the objection. Defendant's attorney stated to the court that if the witness were permitted to answer he would testify that he had been in jail during that time, that the dismissal of charges was a grant of leniency, and the jury should know that. The offer of proof was overruled. Goodlow was fully

cross-examined on the question of whether he agreed to testify if the charges against him were dismissed.

During the cross-examination, Goodlow testified that he knew one Johnny Leach, denied seeing him during the previous two weeks, denied Leach was his cellmate for the last two weeks, and then the following occurred:

"Q. Did you tell Johnny Leach that you put the .38 caliber revolver in Clarence Starr's basement? A. No. MR. FRIEDMAN: Your Honor, I'll ask that that question be stricken and the jury be instructed to disregard it, unless he connects it up. THE COURT: Sustained. MR. FRIEDMAN: Unless there's some foundation laid for that. THE COURT: Lay the foundation. MR. TODT: Well, we would be able to connect it up later, Judge."

Det. Leroy Adkins arrested Starr and Goodlow together. Goodlow gave a statement. Adkins also talked with Starr's stepfather, Quintie Allen, at the police station. Adkins, another officer and Allen then went to Allen's house, which was where Starr lived. Adkins testified that Allen took the officers into the basement. Allen denied this but testified that he accompanied the officers to his house; showed the officers where the basement was, and gave his permission to the officers to search his basement. Thereafter, Adkins found a .38 caliber revolver with two live shells in it in the basement rafters. Adkins identified a gun in court as being the one he found and had turned over to the police laboratory. Adkins testified Goodlow told him the revolver would probably be in Allen's basement. Over objection, Adkins testified that Goodlow told him that Starr said the revolver was at Starr's house. Goodlow denied making that statement.

Quintie Allen was called as a witness for the state. He stated that he took two police officers to his home on the afternoon of October 30, 1969. Apparently the next few answers given by Allen were not to the liking of the prosecutor. The prosecutor then asked the witness whether he had ever been convicted of a felony which was objected to on the grounds that the state could not impeach its own witness. The objection was overruled and the witness admitted to convictions for burglary and larceny, check forgery, and one misdemeanor conviction for non-support. Defendant's motion for mistrial was overruled.

The medical testimony was that the deceased suffered three gunshot wounds. Two bullets were removed from the body. The third bullet passed through the body. The cause of death was multiple gunshot wounds of the chest with a bilateral hemothorax due to multiple lacerations of the lungs. The bullets that were found in the body were turned over to the police. A ballistics expert testified that the bullets found in Mr. Rankin's body had been fired from the .38 caliber revolver found in the basement of Allen's house. The bullets were not offered in evidence.

The defense offered no evidence.

Defendant contends there was no evidence that a robbery occurred; it was error, therefore, to give instruction No. 4—the felony-murder instruction. This contention is premised on the assertion that there was no evidence that money was taken by the culprits. Additionally defendant contends the court erred in giving instructions 3 and 4 on the grounds that the two instructions were unfairly repetitious in mentioning the shooting and mortal wounding of Preston Rankin and thereby overemphasized the possibility of defendant's guilt. Instruction No. 3 submitted conventional murder in the first degree. Instruction No. 4 did require a finding that the property taken was "approximately Six Hundred Twenty-Six Dollars and Eighty-Three Cents, lawful money of the United States, or any part thereof, however small, . . ."; the offense of robbery, how-

ever, does not depend upon the value of the property taken. See 559.010, RSMo 1969, V.A.M.S.

■ It is not necessary to decide whether the evidence supported a finding that precisely $626.83 was taken because there was sufficient circumstantial evidence that some money was taken along with a substantial number of money orders which had some value. This evidence considered along with the testimony that defendant declared to Goodlow that he was going to "stick up Mr. Rankin" and the evidence that later the same evening defendant had in his possession money orders that had been in the possession of the deceased and stated that he "had to shoot the dude" was sufficient to permit the jury to find that Mr. Rankin was robbed and that defendant participated in the robbery. Defendant's contention that there was no evidence of a robbery is overruled.

■ Instructions 3 and 4 are in the form usually used to submit conventional and felony murder in the first degree. There was no undue repetitive emphasis on the shooting and mortal wounding of Preston Rankin. The point is overruled.

Defendant next contends the court erred in permitting the state to impeach its own witness, Quintie Allen, by questioning him about prior convictions because it was not established that Quintie Allen was an adversary or hostile witness to the state. The facts relating to this point have been stated above.

■ This obviously is not a case where the party calling a witness desires to take the "sting" out of the fact that the witness has been convicted of a criminal offense by bringing it out on direct examination rather than letting it be shown for the first time on cross-examination. The state has not shown any legitimate basis for the question but argues that, even if it were improper for the state to impeach the witness, no prejudice resulted to the defendant, citing State v. Smith, 431 S.W.2d 74

(Mo.1968). The state did not undertake to impeach the witness by any prior statement, as was the case in State v. Hogan, 352 Mo. 379, 177 S.W.2d 465 (1944), cited by defendant. Although it was improper for the state to impeach Allen in this manner, the court is convinced that it had no effect on the verdict and was not prejudicial. The point is overruled.

■ Next defendant contends it was error to allow the jury to consider the testimony concerning the bullets which were taken from the body of the deceased and to allow the state to refer to them as "two calling cards" in its closing argument because the bullets were not introduced in evidence.

The ballistics expert testified that a comparison test made of the two bullets found in the body of the deceased and a test bullet fired from the .38 caliber revolver showed that this .38 caliber revolver fired the fatal bullets. The bullets were not offered in evidence. There was no objection to this procedure. The argument was not improper. The point is overruled.

■ Defendant contends it was error to permit Det. Adkins to testify on re-direct examination over a hearsay objection that Goodlow told Adkins that the defendant told Goodlow the revolver was in defendant's basement. Defendant asserts this was the only testimony linking him to the murder weapon.

During the cross-examination of Det. Adkins, the defense attorney asked Adkins who gave him (Adkins) the information that the revolver was in defendant's basement. Adkins replied that James Goodlow gave him that information. It was only after the defense elicited the foregoing answer that the prosecution asked Det. Adkins if Goodlow said how he knew the revolver would be in defendant's basement. During the cross-examination of Goodlow, defense counsel asked Goodlow if he had told the police where the revolver was and Goodlow denied it. Goodlow was then

asked if he (Goodlow) left the revolver at defendant's house and Goodlow denied that also. Goodlow was asked by defense counsel, "Did you tell Johnny Leach that you put the .38 caliber revolver in Clarence Starr's basement?" and Goodlow replied, "No". Defense counsel told the court he would connect it up later but failed to do so.

In the instant case, unlike State v. Kirkland, 471 S.W.2d 191 (Mo.1971), the defense injected into the case a question of the source of the police knowledge as to the whereabouts of the revolver and pursued that question in the cross-examination of Det. Adkins. In these circumstances the court did not err in overruling the hearsay objection. Additionally, there was other substantial evidence that linked the defendant to the revolver and the murder. Defendant told Goodlow he was going to stick up Mr. Rankin; Goodlow saw a revolver that looked like the gun received in evidence in defendant's possession shortly before the robbery and murder; and defendant gave Goodlow money orders that were taken in the robbery. The point is overruled.

Next defendant contends the court erred in curtailing the cross-examination of Goodlow as to where Goodlow had been "since October, 1969, because his long stay in jail and his sudden release on the third day of this trial showed obvious immunity and leniency."

■ The court should have permitted Goodlow to answer the question as to his whereabouts from October 1969 to the date of this trial, as the motivation to get out of jail could have been considered by the jury in assessing Goodlow's credibility. However, the jury was informed in no uncertain terms that the charge of murder in the first degree as well as other charges which were based upon the robbery and murder of Mr. Rankin were dismissed by the state on the morning of Goodlow's testimony in this case. Goodlow was cross-examined in detail as to whether he agreed to testify in

exchange for a dismissal of the charges against him and, when cross-examined with respect to Johnny Leach, tacitly acknowledged he had been in jail the "last couple of weeks".

Defense attorney stated to the court that he was asking the question concerning Goodlow's whereabouts since October 1969 as it had a "bearing upon the point that he has been granted leniency, the charges against him were just dismissed this morning, and I think that the jury should know that."

Goodlow testified that all the charges against him were dismissed just prior to his appearance as a witness, and defense attorney was allowed to read the memorandum dismissing the charges to the jury. The point is overruled.

■ Defendant next contends the court erred in overruling his motion for a mistrial when, during closing argument, the prosecutor allegedly commented on defendant's failure to produce Johnny Leach. Defendant asserts the prosecutor's argument constituted a comment on the failure of defendant to testify in violation of the Const. of Mo., Art. I, § 19; § 546.270, RSMo 1969, and Rule 26.08, V.A.M.R., and constituted improper comment on defendant's failure to produce evidence.

The reference to Johnny Leach did not constitute a comment on defendant's failure to testify.

During the cross-examination of Goodlow the following occurred: "Q. Now, do you know Johnny Leach? A. I know of him. Q. Do you know him? A. Not well, no. Q. What do you mean know of him? Do you know him? A. I know of him. Q. Did you ever meet him? A. Yes. Q. When? A. In '66. Q. Have you seen him since that time? A. Not to my knowledge. Q. Specifically, did you see him within the last couple of days, the last two weeks? A. No. Q. Is Johnny Leach white or colored? A. He's white. Q. Was he in a cell with you in the last

couple of weeks? A. No. Q. Within the last month? A. No. Q. Did you tell Johnny Leach that you put the .38 caliber revolver in Clarence Starr's basement? A. No. MR. FRIEDMAN: Your Honor, I'll ask that that question be stricken and the jury be instructed to disregard it, unless he connects it up. THE COURT: Sustained. MR. FRIEDMAN: Unless there's some foundation laid for that. THE COURT: Lay the foundation. MR. TODT: Well, we would be able to connect it up later, Judge".

In the opening part of the state's summation, the prosecutor called the jury's attention to the fact that the defense never did "connect up" the question asked of Goodlow with reference to whether Goodlow told Leach that Goodlow put the .38 caliber revolver in Starr's basement. No objection was made to the argument. Later, in the closing portion of the state's argument, the prosecutor again adverted to the matter and stated that defense counsel had said, "I'll bring Johnny Leach _ _ _." At this point the defendant objected and there was discussion at the bench during which defense counsel objected to the prosecutor's comment; requested it be stricken and the jury instructed to disregard it; asked that the prosecutor be reprimanded and, in the alternative, that a mistrial be declared—all of which was overruled. The prosecutor then told the jury that what he meant was that although defense counsel said, "I'll connect it up later, Judge", defense counsel did not connect it up.

The point defense counsel made to the court in his objection was that he did not tell the jury that he was going to produce anybody and wanted that statement of the prosecutor stricken. Although the objection was overruled, the prosecutor did subsequently make clear to the jury that what he meant was that the defense did not "connect up" that which the defense attorney said he would "connect up". The point is overruled.

Next defendant contends the court erred in overruling, after evidentiary hearing, the pretrial motion to suppress the .38 caliber revolver, in allowing testimony at trial connecting that revolver with the murder and with the defendant, and in admitting the revolver in evidence. Defendant recognizes that no objection to the admission of the revolver into evidence was made at trial and seeks review under Rule 27.20(c), the plain error rule.

At the time the revolver was offered in evidence, the defendant's attorney said, "We have no objection." In State v. Holbert, 416 S.W.2d 129 (Mo.1967), the court held that an express statement of no objection made by defense counsel constituted an affirmative waiver of the contentions made in the motion to suppress and of the ruling thereon. The point is overruled.

Defendant's other contentions are that the death penalty constitutes cruel and unusual punishment in violation of the U.S. Constitution, Amendments 8 and 14, and that the court erred in excusing a venireman for cause on the state's motion because the venireman did not unambiguously and in unmistakable terms state that he would automatically vote against the imposition of the death penalty.

The death penalty cannot be carried out. Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972); Duisen v. Missouri, 408 U.S. 935, 92 S.Ct. 2855, 33 L.Ed.2d 749 (1972); Terry v. Missouri, 408 U.S. 940, 92 S.Ct. 2876, 33 L.Ed.2d 763 (1972). The sentence is hereby reduced to life imprisonment. State v. Cuckovich, 485 S.W.2d 16, 28 (Mo.banc 1972).

It is further ordered that the clerk of this court forthwith forward a certified copy of this order and judgment to the Warden of the Missouri State Penitentiary at Jefferson City, Missouri, and the Missouri Department of Corrections, Jefferson City, Missouri.

As corrected, the judgment of the circuit court is affirmed.

All of the Judges concur.