STATE of Missouri, Respondent,

v.

Stanley LINGAR, Appellant.

No. 68156.

Supreme Court of Missouri,
En Banc.

March 17, 1987.

Rehearing Denied April 14, 1987.

Daniel T. Moore, Dale E. Nunnery, L. Joe Scott, Poplar Bluff, for appellant.

William L. Webster, Atty. Gen., Elizabeth A. Levin, Asst. Atty. Gen., Jefferson City, for respondent.

ROBERTSON, Judge.

The State charged appellant, Stanley Lingar, with first degree murder by information on March 14, 1985, and filed its notice of intention to seek the death penalty on December 31, 1985. Following a change of venue from Ripley County, the cause proceeded to a jury trial on March 12, 1986, in the Circuit Court of St. Francois County. The jury found appellant guilty of first degree murder; he was sentenced to death.

Appellant appeals both his conviction and sentence.

Because the sentence of death was imposed, this Court is vested with exclusive appellate jurisdiction. Mo. Const. art. V, § 3. We affirm both the conviction and the sentence.

## I.

At approximately 1:10 a.m. on the morning of January 6, 1985, Thomas Scott Allen, a high school junior, left his girlfriend's house, intending to return home before his 1:30 a.m. curfew. He ran out of gas on the way home. As he waited beside his jeep on the shoulder of Highway 160 in Ripley County, a blue Mustang approached, driven by appellant and carrying David Smith, appellant's friend, and a group of hitchhikers they had picked up earlier. Lingar stopped and made inquiry. Scott told Lingar he had run out of gas; Lingar offered to drive Scott to a gas station in town. The hitchhikers left the car. Scott got into the back seat of the Mustang; Lingar, Smith, and Scott drove into the City of Doniphan, purportedly looking for an open gas station. Finding no station open in town, Lingar drove out of town, ostensibly still looking for gasoline.

As appellant drove out of town, he began talking in a strange accent, saying "It sure is a bloody f_____ mess." Smith responded in a similar vein. Lingar headed west toward Lingo Lake. On the way, he told Scott to take off his winter coat. Scott refused; Lingar told Scott that if he didn't do as he was told, he, Lingar, would not take him back to town. Scott removed his coat. When they arrived at Lingo Lake, Lingar used similar threats to force Scott to remove all of his clothing.

As Scott was sitting nude in the backseat, Lingar ordered Scott to masturbate. Scott again refused; Lingar again threatened not to take him back to town. When Scott had difficulty complying with Lingar's order, Lingar drove to his parents' house, and while Smith and Scott waited in the car, appellant retrieved a .22 automatic rifle from inside. Lingar returned to the

car, pointed the rifle at Scott and said, "Now I'll bet you're going to do what I say without arguing."

Lingar drove back to Lingo Lake, parked, and again ordered Scott to masturbate. Scott asked permission to urinate outside the car. Lingar granted Scott's request, got out of the car himself, laid the rifle on the roof of the Mustang, and shot Scott in the back.

Scott fell to his knees, but managed to pull himself into the driver's seat of the car. Attempting to escape, Scott tried to start the car; because he failed to disengage the clutch, the car would not start. As Scott continued to attempt to start the car, Lingar went to the passenger side, stuck the rifle in through the open door, and shot Scott in the head. Scott fell to the ground on the driver's side. Again he tried to get up, Lingar shot him a third time. Scott attempted to rise again. Complaining that Scott was still alive, Lingar grabbed a tire jack from the trunk and struck three or four blows to Scott's head.

Once more, and with greater and greater difficulty, Scott tried to get up. Lingar, frustrated by Scott's tenacious grip on life, started the car, backed it up and ran into Scott, not once, but twice. Finally, Lingar and Smith drove away from Lingo Lake, leaving the still naked Scott to die on the ground from his wounds.

From the lake, Lingar and Smith drove to Eddie Lingar's house. There, they discussed the situation with Lingar's brother, and decided to dispose of the body. Lingar and Smith returned to Lingo Lake, found Scott's body, redressed it, placed it in the trunk of the Mustang and drove it to a bridge over the Eleven Point River. Hoping that the swift current in the river would wash it away, Lingar and Smith threw Scott's body over the bridge. The next morning, Lingar and Smith attempted to clean the blood out of the Mustang, discarded some of Scott's personal effects which were left in the car, and burned the forearm and handle of the rifle which Lingar had used to kill Scott. Then they returned to Lingo Lake to remove the bloody snow from the site of the killing.

The next morning, Monday, January 7, 1985, Lingar and Smith sold a pickup truck and "pawned" the Mustang to a Sherman Chambers. With the money obtained from Chambers, they drove to Bowling Green, Kentucky, where they disposed of the rest of the rifle.[1] On Tuesday, January 8, 1985, Sheriff Pepmiller, as part of the investigation began when Scott did not return home on January 6, discovered the Mustang at Chambers' salvage yard.

From Kentucky, Lingar called his parents. Upon learning that the authorities wanted to talk to him, Lingar called Sheriff Pepmiller from Bowling Green and agreed to return to Doniphan. Upon returning to Ripley County, Lingar and Smith each gave a statement. Based on those statements law enforcement officers obtained a warrant to search the Mustang.[2] In the car, law enforcement officers subsequently found a .22 caliber shell casing, as well as blood stained carpet and paneling in the trunk. All blood stains were consistent with Scott Allen's blood. The water patrol recovered Scott's body from the river on January 14.

Lingar was charged with first-degree murder and given notice that the State intended to seek the death penalty.

This case went to trial March 12, 1986. The jury found appellant guilty of first-degree murder. During the punishment phase of the trial, the jury imposed a death sentence upon appellant, finding as a basis for imposing capital punishment that the murder was outrageously and wantonly vile, horrible or inhuman in that it involved torture or depravity of mind, § 565.032.-2(7), RSMo 1986, and that the murder was committed while appellant was engaged in the perpetration of a kidnapping, § 565.-

---

1. Law enforcement officers retrieved the .22 caliber rifle from the Bowling Green, Kentucky area. A forensic specialist testified that bullet fragments obtained from Scott's body had been fired from the rifle recovered in Bowling Green.

2. More details regarding the seizure and search of the vehicle can be found at Point VI, infra.

032.2(11). Following a pre-sentence investigation, the trial judge sentenced appellant to death. Appellant appeals his conviction and sentence.

## II.

Appellant claims that the trial court erred in denying his motion for judgment of acquittal on the ground that the State's evidence was insufficient to prove venue. Specifically, appellant argues that the State failed to prove the location of Lingo Lake, and that because law enforcement officials from three different counties were involved in the investigation, the jury could reasonably conclude that the crime occurred in any one of those counties.

■■■ While venue must be proved,[3] it is not an integral part of an offense and thus need not be proven beyond a reasonable doubt or by direct evidence; instead, venue may be inferred from all the evidence. *State v. Garrett,* 416 S.W.2d 116, 118 (Mo. 1967). On review, the standard for whether venue has been established is whether it could reasonably be inferred from the facts and circumstances that the crime with which the defendant is charged occurred within the trial court's jurisdiction. *State v. King,* 662 S.W.2d 304, 308 (Mo.App. 1983).

■■ Section 565.001.4, RSMo 1986, establishes venue in this case. It provides in pertinent part:

> Persons accused of committing offenses against the laws of this state, except as may be otherwise provided by law, shall be prosecuted:
>
> (1) In the county in which the offense is committed; or
>
> (2) If the offense is committed partly in one county and partly in another, or if the elements of the crime occur in more than one county, then in any of the counties where any element of the offense occurred.

3. The right to proper venue is guaranteed by Mo. Const. art. I, § 18(a).

4. Deliberation is a necessary element of first degree murder. § 565.020.1, RSMo Cum.Supp.

David Smith testified that he and appellant initially picked up the victim on Highway 160, one mile from Doniphan, in Ripley County; they drove to Lingo Lake, located approximately three miles from appellant's parents' house, also in Ripley County; when Scott was unable to perform the sexual act demanded by appellant, they drove to appellant's parents' house where appellant picked up a rifle; the three then returned to Lingo Lake where Scott was subsequently murdered.

From this evidence it is reasonable to infer that the crime was committed in Ripley County or that appellant deliberated[4] the crime when he picked up the gun there. Either conclusion is sufficient for purposes of venue under § 565.001.4(1) and (2). The point is denied.

## III.

Appellant next argues that the trial court erred in overruling his motion for judgment of acquittal on the ground that the State failed to identify appellant at trial as the man charged with the crime.

It is axiomatic that the criminal agency of the accused must be proved. *State v. Murphy,* 415 S.W.2d 758, 760 (Mo.1967). The evidence must show that the defendant is the person who committed the crime. *State v. McIntosh,* 546 S.W.2d 756, 758 (Mo.App.1977). The procedure used at trial to identify the defendant lies within the prudent discretion of the trial court. *State v. Hubbard,* 659 S.W.2d 551, 559 (Mo.App. 1983).

■■ Appellant does not claim insufficiency of the evidence with regard to eye witness' description of or ability to observe him as the perpetrator of the crime. Cf. *State v. Cook,* 463 S.W.2d 863 (Mo.1971). Instead, he argues that the State should have provided an in-court identification to establish him as the man standing trial. Although appellant did not take the stand, and no witness physically indicated his

1984. It means that the defendant considered taking the life of another while in a cool and deliberate state of mind. *State v. Armbruster,* 641 S.W.2d 763, 765 (Mo.1982).

presence in the courtroom, we find that the evidence was sufficient to identify appellant as the accused in this case.

Jimmy Lee Bessent, one of the hitchhiking juveniles, testified that "Stanley Lingar" picked his companions and him up on Highway 160 and later picked up Scott Allen. Sherman Chambers testified that he had operated an auto salvage business in Doniphan for fifteen years, that he knew "the defendant," and that on January 6, 1985, he wrote out a check to "Stanley Lingar" for a 1972 Chevrolet and a 1975 Mustang. Most significantly, David Smith, a co-participant in the crime and a man intimately acquainted with appellant, referred to appellant by name throughout his testimony.

Appellant was the sole defendant on trial. The jury could clearly infer that the "Stanley Lingar" referred to by the witnesses was the defendant present in court. We can find no possible confusion as to appellant's identity; as such, his contention is "bereft of substance." *State v. Stout,* 604 S.W.2d 710, 713 (Mo.App.1980). The point is denied.

### IV.

Appellant next argues that the trial court erred in refusing to sustain his challenge for cause to a venireman on the basis of the venireman's responses to voir dire questions concerning a defendant's failure to testify.

The trial court possesses broad discretion in determining the qualifications of prospective jurors; the trial court's ruling will not be disturbed on appeal unless the ruling is against the evidence and constitutes a clear abuse of discretion. *State v. Smith,* 649 S.W.2d 417, 422 (Mo. banc), cert. denied, 464 U.S. 908, 104 S.Ct. 262, 78 L.Ed.2d 246 (1983).

During voir dire, counsel for appellant asked whether any member of the venire panel would consider the defendant's failure to testify as evidence of guilt. Venireman Wade responded. The following exchange took place:

MR. MOORE: Mr. Wade, you would?

VENIREMAN WADE: I feel that if a man is innocent, he should testify.

MR. MOORE: If in this case the defendant does not testify, that would be evidence—

VENIREMAN WADE: It's admitting he's guilty.

MR. MOORE: Even if the instructions and the law were contrary to that, you could not follow those instructions?

VENIREMAN WADE: I could follow the instructions, but the evidence would have to be very to a preponderance that he was innocent before I could even say he was innocent.

MR. MOORE: Maybe I'm not making my questions clear.

VENIREMAN WADE: I've got an open mind, but this is the way it is. I feel a man should take the stand for his own good, and if he don't, if he don't take the stand I feel like there's something that's not coming out in the open, quite in the open.

MR. MOORE: You would associate that with evidence of guilt?

VENIREMAN WADE: Yes sir.

The prosecutor later reexamined Mr. Wade as follows:

MR. CALLAHAN: Once again, my question, Mr. Wade—And once again, I'm not trying to put words in anybody's mouth. You indicated that you'd like to hear the defendant testify. Under the law he has an absolute right not to testify. The question is, could you put your personal preference aside? In other words, what you like or—You may have to change the constitution on this one—but could you put your personal view aside and follow the instructions of the Court or not?

VENIREMAN WADE: **I can follow the Judge's instructions, the instructions of the Judge, yes.**

MR. CALLAHAN: The fact that the defendant chose not to testify, could you not count that as evidence?

VENIREMAN WADE: It couldn't be evidence. **I'd have to follow the instructions of the court.**

MR. CALLAHAN: And you wouldn't count it as evidence?

VENIREMAN WADE: No.

The trial court did not conduct an independent examination of Mr. Wade on this issue.

█ An accused must be afforded a full panel of qualified jurors before he is required to expend his peremptory challenges. Failure of the trial court to grant a legitimate challenge for cause is reversible error. *State v. Stewart,* 692 S.W.2d 295, 298 (Mo. Banc 1985); *State v. Hopkins,* 687 S.W.2d 188, 190 (Mo. banc 1985). Absence of an independent examination by the trial court justifies a more searching review by an appellate court of the challenged juror's qualifications. *State v. Wolff,* 701 S.W.2d 777, 778 (Mo.App.1985).

█ The critical question is whether, on the whole, Venireman Wade's responses indicate his ability to evaluate the evidence fairly and impartially. Recognizing the importance of this inquiry, we are mindful that the trial court, in its unique position to observe the intangibles of gesture, inflection and demeanor, occupies the best position to determine the qualifications of a prospective juror.

Here, although Venireman Wade initially indicated his belief that an innocent man should take the stand on his own behalf and that he would likely draw an inference of guilt from the defendant's failure to testify, he ultimately stated in unequivocal terms that he could follow the instructions of the court and would not consider the failure to testify as evidence against the defendant. In this respect, the situation is distinguishable from that in *Stewart,* 692 S.W.2d at 299, and *Hopkins,* 687 S.W.2d at 191, where the challenged venireman never unequivocally stated that he could set aside his personal feelings and come to an impartial decision based on the facts and instructions of the court. Based on Wade's unequivocal assurances of impartiality, and in light of the trial court's first-hand observation of him as those assurances were made, we find no error in the trial court overruling challenge for cause to venireman Wade.

**V.**

Appellant next urges that the trial court erred in admitting State's Exhibit 37, a plea agreement between David Smith and the Ripley County prosecutor.

The difficulty with appellant's argument lies in the fact that the existence of the plea arrangement was injected for the first time by defense counsel on cross-examination. After defense counsel had raised the matter several times during the course of his cross-examination of Smith, the following exchange took place:

Q. And even though you and Stanley were together all that night, your testimony here is based upon the fact that the first degree murder charge has been released or dismissed against you?

A. Yes.

Q. And you would not testify otherwise, would you?

A. Not still in first degree murder charges, no.

Q. As a matter of fact, your agreement is that you have to come down here and testify in order to get the charges dismissed against yourself?

A. That's part of the agreement.

Q. And part of the agreement is that you will try and convict Stanley on his charge, right?

A. You said I'm trying to convict Stanley?

Q. Uh-huh.

A. No. I'm just telling a story of what happened.

█ Clearly, defense counsel was attempting to impeach Smith by showing that he had an incentive to manufacture a story that would result in appellant's conviction. It is well established that on redirect examination, it is proper to examine a witness on any matter which tends to refute, weaken or remove unfavorable inferences resulting from testimony on cross-examination, notwithstanding that the facts elicited may be prejudicial to the defendant. *State v. Crawford,* 619 S.W.2d 735, 740 (Mo.1981). Furthermore, where the defendant has injected an issue into the case, the State may be allowed to admit otherwise inadmissible evidence in order to explain or counteract a

negative inference raised by the issue defendant injects. *State v. Starr*, 492 S.W.2d 795, 799 (Mo. banc 1973).

■■■■■ Of course, in general, it is error to allow the State to admit into evidence or even disclose to the jury that a jointly accused defendant has been convicted or plead guilty. *State v. Jordan*, 627 S.W.2d 290, 293 (Mo. banc 1982). The plea bargain agreement here was not introduced as substantive evidence by which the jury could infer the guilt of appellant, but rather, to rehabilitate the credibility of the witness. In particular, the exhibit showed that under the terms of the agreement, Smith's reduced sentence was not conditional upon the verdict rendered against appellant. We find that under these circumstances, the trial court committed no error by allowing admission of the plea bargain agreement.

## VI.

Appellant next raises a fourth amendment challenge to the admission of evidence obtained as the result of the alleged illegal seizure of his automobile.

Briefly, the facts pertinent to this issue are as follows: On Monday, January 7, Sheriff Pepmiller interviewed several juveniles regarding the disappearance of Scott Allen. Based on the information he received, the Sheriff began looking for a 1975 Mustang. On the same day, appellant and David Smith took a 1972 Chevy truck and the 1975 Mustang to a salvage yard owned and operated by Sherman Chambers. They sold the truck to Mr. Chambers for $150. The Mustang was pawned for the same amount.

Appellant and Smith then drove out of the state in a car owned by appellant's father. They arrived in Bowling Green, Kentucky, on Monday evening. On Tuesday, January 8, Sheriff Pepmiller located the Mustang at Chamber's salvage yard. After learning from Chambers that appellant had pawned the Mustang, Pepmiller carried out a brief examination of the car and, with the help of Chambers, covered it

with a plastic tarpaulin, before leaving. Pepmiller returned to the salvage yard the next morning with two other officers. Chambers again explained his business transaction with appellant; he then towed the Mustang to the police station where it was impounded.

The next day, January 10, appellant and David Smith returned to Doniphan. They were taken to the police station where each gave a statement. Based on information gained through these statements, Sheriff Pepmiller executed affidavits to obtain a search warrant for the Mustang on January 11. A search warrant was issued; on January 14–15, the Mustang was processed and the evidence in question seized.

Prior to trial, appellant moved to suppress the items of evidence gathered by police during their search of the Mustang. Following a hearing, the trial court denied the motion. Appellant's objection to introduction of the evidence was later renewed at trial and overruled.

Appellant argues that although a warrant was obtained prior to search of the Mustang,[5] the evidence obtained as a result of the warrant should have been excluded because the initial warrantless seizure of the car was in violation of U.S. Const. amend. IV and XIV and Mo. Const. art. I, § 15.

### A.

■■■■ Our initial inquiry is whether appellant has standing to object to the warrantless seizure of the Mustang.

The proponent of the motion to suppress has the burden of establishing that his own constitutional rights were violated by the challenged search or seizure. *State v. McCrary*, 621 S.W.2d 266, 273 (Mo. banc 1981); *State v. Nichols*, 628 S.W.2d 732, 736 (Mo.App.1982). The test for standing to assert a violation of Mo. Const. art. I, § 15 is "whether [the] defendant was entitled to and did have a reasonable expectation that the property would be free from governmental intrusion other than by a

---

5. The search referred to is that of January 14–15. Appellant makes no allegation concerning the preliminary examination of the Mustang on January 8.

proper and lawful search and seizure." *In re J.R.M.*, 487 S.W.2d 502, 508 (Mo. banc 1972). This is identical to the "legitimate expectation of privacy" test adopted in *Rakas v. Illinois*, 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978), for standing under the fourth amendment. *McCrary*, 621 S.W.2d at 273.

Appellant does not attempt to show that he has standing to object to the seizure at either the hearing on the motion to suppress or in his brief on appeal. Under the facts and circumstances presented here, we believe that appellant lost whatever reasonable expectation of privacy he had in the Mustang when he pawned the car and left it at Sherman Chamber's salvage yard.

In *State v. Achter*, 512 S.W.2d 894, 899 (Mo.App.1974), the court stated:

> one has no standing to complain of the search or seizure of property which he has voluntarily discarded, left behind, or otherwise relinquished his interest so that he no longer retains a reasonable expectation of privacy with regard to it at the time of search or seizure. Such an abandonment is primarily a question of intent and all relevant circumstances existing at the time of the alleged abandonment should be considered.

(citations omitted). See also *McCrary*, 621 S.W.2d at 273. The evidence in this case clearly indicates that appellant abandoned the Mustang—and whatever reasonable expectation he may have had in it—when he pawned the car to Chambers.

Appellant cannot rely on the fact that the Mustang was not sold but only pawned, i.e., left as security for a loan, to claim that he maintained a reasonable expectation of privacy. The circumstances here show not only that appellant relinquished all control over the vehicle but that he did not intend to return for it.

According to David Smith, he and appellant took the Chevy and the Mustang to Chamber's salvage yard because they needed money to flee the state after the mur-

der. Appellant sold the Chevy; he tried, but could not sell the Mustang—he did not have title to it.[6] Chambers took the keys from Lingar; there is no evidence that Lingar kept a key for himself. Finally, after cashing the check for both vehicles, appellant and Smith fled the state in a car belonging to appellant's father in order to avoid detection and arrest.

In sum, there is simply no indication that appellant retained any subjective expectation of privacy in or security of the Mustang. Where an item is discarded in connection with flight from the law, protection against governmental intrusion upon that item is neither a "reasonable" nor a "legitimate" expectation. *Achter*, 512 S.W.2d at 900.

### B.

Even assuming, arguendo, that appellant has standing, his argument must fail for at least two additional reasons. First, the Mustang was not illegally seized; the person in possession of the car, Sherman Chambers, consented to the seizure. Second, even were we to find the seizure illegal, the evidence introduced at trial was not "fruit of the poisonous tree" so as to require exclusion.

### 1.

A warrantless search or seizure is valid under the fourth amendment if made with proper voluntary consent. *State v. Blair*, 638 S.W.2d 739, 750 (Mo. banc 1982), cert. denied, 459 U.S. 1188, 103 S.Ct. 838, 74 L.Ed.2d 1030 (1983). It is well-settled law that "the consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom the authority is shared." *State v. Johns*, 679 S.W.2d 253, 262 (Mo. banc 1984), quoting *United States v. Matlock*, 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974).[7]

---

**6.** It was revealed at the hearing on the motion to suppress that a title check on the Mustang produced a name other than appellant's as the owner of record.

**7.** Although these cases involve consent to search, we find the same principles apply to the initial seizure of the Mustang.

■ If appellant did not relinquish total control over the Mustang when he pawned it to Sherman Chambers and left the state, Mr. Chambers had at least sufficient authority over the car to permit the police to take it from his lot. We are not concerned here with technical concepts of property law or whether one in a "bailment" situation generally has the right to relinquish an item in his possession to law enforcement officials. In the constitutional arena, our inquiry is simply whether Chambers had such access or control over the car to make it reasonable to recognize his authority to permit the seizure and to charge appellant with the risk that such authority might be exercised. Under the present facts, we find that Chambers possessed the requisite degree of control over the Mustang to voice a valid consent to its seizure.

### 2.

■ Even were we to conclude otherwise, and find that the initial seizure of the Mustang was illegal, the taint of such illegality did not extend to recovery of evidence from the car so as to require its suppression at trial.

In determining whether the exclusionary rule should apply to render evidence inadmissible as "fruit of the poisonous tree," the question is "whether, granting establishment of the primary illegality, the evidence to which ... objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963), quoting Maguire, Evidence of Guilt, 22 (1959).

In this case, the evidence recovered from the Mustang and subsequently used at trial was the result of a search conducted pursuant to a valid warrant. The warrant was issued on the basis of probable cause arising from statements made by appellant and David Smith when they voluntarily returned to Doniphan on January 10 and were interviewed by police officers. Thus, the evidence was lawfully procured by way of interrogation—a source independent of the initial seizure of the Mustang. If indeed the tree itself was poisonous, the gathering of the fruit was not.

### VII.

In his next point, appellant argues that the trial court erred in overruling his "Motion to Make More Definite and Certain" the State's response to his discovery request pursuant to § 565.005, RSMo 1986. The interpretation of the discovery requirements of § 565.005 is a matter of first impression.

Prior to trial, appellant filed a request with the State under § 565.005 to provide: 1) a list of all aggravating or mitigating circumstances; 2) the names of all persons to be called as witnesses; and 3) copies or locations and custodian of any books, papers, documents, photographs, or objects to be offered as evidence with respect to the punishment phase of trial. The State filed its response by "Notice of Intention to Seek Death Penalty and of Evidence in Aggravation," which set out by number the aggravating circumstances upon which it intended to rely and in addition, stated:

> That the witnesses and physical evidence which the State intends to use during the second stage are those witnesses and/or evidence which is referred to in the reports which have previously been turned over to defense counsel in earlier disclosures made pursuant to discovery requests. **Such evidence would include the testimony of David Smith.** (Emphasis added).

Appellant argues that this response, which "merely referred Defense Counsel to ... material previously made [available]," was inadequate under the statute.

Prior to the enactment of § 565.005, discovery pertaining specifically to the punishment phase of a capital murder trial was limited to "evidence in aggravation." § 565.006.2, RSMo 1978 (repealed effective October 1, 1984). The State is now required, in addition, to disclose the names of witnesses it intends to call and exhibits it intends to offer. § 565.005.1(2) and (3). The statute provides that the disclosures required under subsection 1 "are supple-

mental to those required by rules of the supreme court," § 565.005.2, but does not indicate the manner in which the information must be provided.

A basic purpose of discovery is to facilitate the search for truth by eliminating, as far as possible, concealment or surprise at trial. *State v. Sykes*, 628 S.W.2d 653, 656 (Mo.1982). In order to fulfill that objective, the reply to requests for discoverable information must be broad enough to protect against omission yet narrow enough to be responsive. Clearly, § 565.005 is designed to provide for discovery of the matters specified in subsection 1 as they relate particularly to the punishment phase of trial. As far as the method by which the information sought under § 565.005.1 is provided, we find no objection to a response directing counsel to disclosures already made through general discovery if the referenced matter is intended in good faith for use in the punishment phase of trial. Broad reference to previous disclosures without limitation or particular reference to matters the State intends to use in the penalty phase is not responsive.

Turning attention to the response made by the State in this case, we find that the specific endorsement of David Smith as a witness to be called at the second stage of trial was sufficiently responsive to appellant's request under § 565.005.i(2). David Smith was, in fact, the only witness called during that phase. Appellant does not claim, nor can we find any possibility, that he was surprised by Smith's appearance.

■■■ The State's response to appellant's request for exhibits under § 565.005.-1(3), however, was only a general reference to matters previously disclosed, made without particularity to those exhibits intended for use at the punishment phase of trial. As such, it was unresponsive and should have been ordered more definite and certain by the trial court. We find, however, that failure to grant appellant's motion does not entitle him to relief. "[T]he mere

failure to disclose does not ... entitle appellant to a new trial, but it must be shown that nondisclosure resulted in fundamental unfairness." *State v. Jones*, 594 S.W.2d 932, 936 (Mo.1980).

Appellant has made no attempt to show that he was prejudiced in any way by the State's failure to comply with his request for discovery under § 565.005.1(3). Only one exhibit was offered during the punishment phase of trial—a letter written by appellant to Smith. Appellant had notice of this evidence through prior discovery, and did not object to admission of the exhibit on the ground that he was surprised by its existence. *Sykes*, 628 S.W.2d at 656–57. There being no prejudice, appellant's point is denied.

### VIII.

Appellant next claims that he is entitled to a new trial on the basis of instructional error.

■■■ The State concedes that the trial court erred in submitting Instruction No. 9, which reads:

Defendant's guilt or innocence depends on the matters stated in Instructions No. 6 & No. 8 and it does not matter that any other person who may have been involved has been convicted of some other offense.

The instruction is patterned after MAI–CR2d 3.68, which is to be given only in conjunction with MAI–CR2d 2.12. MAI–CR2d 3.68, Notes on Use 1. The State did not request MAI–CR2d 2.12, nor was it given.[8] Despite the error, we do not believe appellant was prejudiced by the submission of Instruction No. 9.

The prejudicial effect of an instruction given in violation of the notes on use is to be judicially determined. Rule 28.02(e). Prejudice occurs when the jury "may have been adversely influenced by an erroneous instruction." *State v. Rodgers*, 641 S.W.2d

---

**8.** MAI–CR2d 2.12 deals with accessorial liability for a criminal act. At the hearing on appellant's motion for new trial, the prosecutor indicated that he originally submitted a 2.12 instruction before David Smith was removed as a defendant. The instruction was not requested because although the case involved complicity, the evidence showed that the defendant had himself committed each element of the crime. See MAI–CR2d 2.12, Notes on Use 6(d).

83, 85 (Mo. banc 1982), quoting *State v. Aitkens,* 352 Mo. 746, 179 S.W.2d 84, 94 (1944).

In the present case, the jury was not adversely influenced by submission of Instruction No. 9. In fact, if the instruction had any effect on the jury, it was to appellant's benefit. The evidence clearly showed a complicity situation since the entire basis of David Smith's testimony was that he and appellant acted together during the murder of Scott Allen. Furthermore, the jury was made aware of Smith's guilty plea during cross-examination by defense counsel. The instruction did nothing more than inform the jury that Smith's involvement in and conviction of the offense had no bearing on their determination of appellant's guilt or innocence. The point is denied.

## IX.

During the punishment phase of trial, the court allowed certain matters into evidence which appellant claims was prejudicial error. His first challenge is to evidence of a homosexual relationship with David Smith. The second is to the introduction of a letter written by appellant to Smith that arguably contained references to trial strategy and actions taken by counsel in preparation for appellant's defense. Appellant asserts that both evidentiary admissions were irrelevant and so inflammatory that he is entitled to a new trial.

We have long recognized that the trial court has discretion during the punishment phase of trial to admit any evidence it deems helpful to the jury in assessing punishment. *State v. Malone,* 694 S.W.2d 723, 727 (Mo. banc 1985), cert. denied, —— U.S. ——, 106 S.Ct. 2292, 90 L.Ed.2d 733 (1986). Our review of both matters is therefore for abuse of the trial court's discretion.

### A.

On the second day of the penalty phase of trial, the prosecutor revealed in his opening statement that he would recall witness David Smith, who would testify that he and appellant were involved in a homosexual relationship. Following the opening statement, a conference was had at the bench. Defense counsel objected to introduction of the testimony on grounds that it was irrelevant and prejudicial. The trial court overruled the objection.

Thereafter, David Smith was called to the stand. The prosecutor asked only three questions pertaining to Smith's relationship with appellant: the type of relationship it was; how long it lasted; and whether it continued during the periods they lived together.

We do not believe the trial court erred in admitting the challenged testimony. The testimony was heard in the punishment phase of the trial. The focus of the punishment phase of a death penalty case is entirely different from that of the guilt phase. The jury is asked to consider not only the nature and circumstances of the crime but also the character of the defendant. *Gregg v. Georgia,* 428 U.S. 153, 197–8, 96 S.Ct. 2909, 2936, 49 L.Ed.2d 859 (1976). Smith's testimony is relevant in this regard.

One of the aggravating circumstances submitted by the State was that the murder of young Scott Allen was outrageously or wantonly vile, horrible or inhuman in that it involved torture or depravity of mind. § 565.032.2(7). Appellant's homosexuality is also relevant to the circumstances of the murder; it tends to explain appellant's desire to force a young man not only to remove his clothing but also to see him masturbate. The evidence reveals that it was Scott's inability to perform the act demanded—and Lingar's apparent unwillingness to be disappointed—that led Lingar to obtain a rifle, point it at Scott, and say, "Now I'll bet you're going to do what I say without arguing."

The State did not dwell on the issue unduly. Nor did the State seek to inflame the jury with it. The point is denied.

### B.

Appellant also claims that the trial court committed prejudicial error in allowing the State to admit, during the punishment

phase of trial, a letter written by appellant to David Smith. The letter read in part:

My lawyer has got a bunch of evidence thrown out of court already. Like, all the stuff at Lingo wont ever be mentioned again, *unless* you say something about it. and my lawyer is still trying to get more evidence thrown out, I think the only evidence they have left is, what appears to be some blood smears in the trunk of the car and 5 hairs found on the trunk latch, and some gun, and they have the two statements that you and me wrote, But, they *ain't* nothing to worry about, because, I found out that if we don't testify against each other, then the statements are *worthless*, Dave, if we both just stay quiet and don't say *anything*, then here is what will happen! I will go to my Jury trial ... and if we don't say anything *at all* then my charges will either be dropped or reduced so low that i wont hardly get any time in prison, 'if any.'

Objection was made to introduction of the letter in appellant's motion to suppress and again at trial on the grounds of attorney-client privilege and various constitutional protections, including the privilege against self-incrimination. In addition, a request was made to obliterate the portions of the letter concerning information gained from appellant's attorney or possible trial strategy. The trial court overruled appellant's objections and allowed the letter to be introduced in its entirety.

We first consider appellant's objections to introduction of the letter itself, and find that they were properly overruled by the trial court.

■■■ Protection under the attorney-client privilege belongs to the client. *State v. Carter*, 641 S.W.2d 54, 57 (Mo. banc 1982). Assuming that the letter did, in fact, contain information communicated in confidentiality from counsel to appellant,[9] the privilege was waived when appellant disclosed the information to Smith. *State v. Fingers*, 564 S.W.2d 579, 582 (Mo.App. 1978). As to the claimed violation of appellant's privilege against self-incrimination, we find that any statements inferring guilt were made without compulsion by the state or expectation of privacy.[10] Furthermore, the letter was introduced during the penalty phase of trial, and thus played no part in the jury's determination of guilt or innocence. The letter was probative of appellant's lack of remorse, an appropriate and important consideration for the jury in fixing punishment. The trial court therefore did not abuse its discretion in allowing the letter to be admitted.

■■■ Turning attention to appellant's argument regarding the references to trial strategy and exclusion of evidence contained in the letter, we find that although it might have been preferable to have excised these matters, there was no prejudicial error.

Appellant does not claim that the information was protected by the work-product doctrine. Cf. *State v. Hardin*, 558 S.W.2d 804, 807 (Mo.App.1977). He argues only that the information was prejudicial because the jury could infer that they had not received all the evidence they were entitled to hear. However, the letter was premised on appellant's expectation that Smith would not testify; because Smith in fact testified, the jury could equally infer that they had heard all of the evidence.

Appellant cites *State v. Johnson*, 456 S.W.2d 1 (Mo.1970), in support of his claim of prejudicial error. In *Johnson*, the defendant wrote a letter to a third person in which he stated that an accomplice had already been tried and convicted, and that his lawyer told him that if the situation didn't change, he would "get the same thing or more." This Court held that introduction of this portion of the letter constituted prejudicial error because the com-

---

9. It may be questioned whether the information related by appellant to Smith was actually gained through "confidential communications" with his attorney or simply represented appellant's observation of what occurred during pretrial proceedings and his own surmises as to the outcome of trial. See *State v. Fingers*, 564 S.W.2d 579, 583 (Mo.App.1978).

10. In the letter, appellant indicated that he was aware of the censorship of prison mail.

bined effect of the accomplice's conviction and the lawyer's appraisal was such that "the jury could well believe that what a previous jury had done to Quinn [accomplice] should also be done to defendant." *Johnson*, 456 S.W.2d at 4. The situation here is distinguishable because appellant's letter was not introduced as evidence of guilt or used to convict.

## X.

Appellant finally argues that the penalty of death in this case is excessive and disproportionate to similar cases, considering the crime and the defendant, and that this Court, in the exercise of its independent review, should set aside his sentence of death. § 565.035.3(3), RSMo 1986.

The facts of this case show a level of inhumanity and depravity similar to or greater than other cases in which the death penalty was imposed upon a finding that the murder involved "torture or depravity of mind and that, as a result thereof they were outrageously or wantonly vile or horrible or inhuman." *State v. Gilmore*, 681 S.W.2d 934 (Mo. banc 1984); *State v. Preston*, 673 S.W.2d 1 (Mo. banc 1984), cert. denied, 469 U.S. 893, 105 S.Ct. 269, 83 L.Ed.2d 205 (1984); *State v. Guinan*, 665 S.W.2d 325 (Mo. banc 1984), cert. denied, 469 U.S. 873, 105 S.Ct. 227, 83 L.Ed.2d 156 (1984); *State v. Battle*, 661 S.W.2d 487 (Mo. banc 1983), cert. denied, 466 U.S. 993, 104 S.Ct. 2375, 80 L.Ed.2d 847 (1984); *State v. Smith*, 649 S.W.2d 417 (Mo. banc 1983), cert. denied, 464 U.S. 908, 104 S.Ct. 262, 78 L.Ed.2d 246 (1983); *State v. LaRette*, 648 S.W.2d 96 (Mo. banc 1983), cert. denied, 464 U.S. 908, 104 S.Ct. 262, 78 L.Ed.2d 246 (1983); *State v. Trimble*, 638 S.W.2d 726 (Mo. banc 1982), cert. denied, 459 U.S. 1188, 103 S.Ct. 838, 74 L.Ed.2d 1031 (1983); *State v. Blair*, 638 S.W.2d 739 (Mo. banc 1982), cert. denied, 459 U.S. 1188, 103 S.Ct. 838, 74 L.Ed.2d 1030 (1983); *State v. Newlon*, 627 S.W.2d 606 (Mo. banc 1982), cert. denied, 459 U.S. 884, 103 S.Ct. 185, 74 L.Ed.2d 149 (1982); *State v. Mercer*, 618 S.W.2d 1 (Mo. banc 1981), cert. denied, 454 U.S. 933, 102 S.Ct. 432, 70 L.Ed.2d 240 (1981).

Appellant picked up a young man who ran out of gas on the highway, offering to drive him to a gas station. Instead, he drove to a secluded area and forced Scott Allen to disrobe and attempt to masturbate upon threat of leaving him out nude, in the cold January weather. When Scott was unable to perform the sexual act to appellant's satisfaction, he drove three miles to his parent's house to pick up a rifle. Pointing the rifle at Scott, appellant said, "Now I'll bet you're going to do what I say without arguing." He drove back to the secluded area and again forced Scott to masturbate, this time at gunpoint. Three times, · appellant took aim and fired at Scott, who continued, to appellant's frustrated surprise, to struggle for his life. Appellant remarked, "He's not dead yet," as he went to the trunk of the car, removed a tire jack and beat the prostrate victim in the head several times. When Scott still would not die, and as he tried to raise himself again from the ground, appellant drove the car into Scott's body not once, but twice. He left Scott lying in the snow until he returned to throw the body into the river.

It is hard to imagine a more brutal, senseless taking of innocent life. Not only was the victim subjected to sexual and psychological abuse, *Trimble*, 638 S.W.2d at 730; *Mercer*, 618 S.W.2d at 3–4, but he had ample time to contemplate his fate, *Preston*, 673 S.W.2d at 4; *Battle*, 661 S.W.2d at 493–94; *Smith*, 649 S.W.2d at 420; *LaRette*, 648 S.W.2d at 99; *Trimble*, 638 S.W.2d at 731, *Mercer*, 618 S.W.2d at 4.

The evidence also demonstrates appellant's lack of remorse for the crime. He carried out a systematic cleaning of the Mustang, returned to the murder scene with a shovel to remove the bloody snow, and then fled the state. Upon returning to Doniphan, he instructed David Smith what to tell law enforcement officials. The letter written to David Smith while appellant was awaiting trial displays his confident hope to go unpunished because of legal technicalities.

The mitigating circumstances appellant offers are insufficient, singly or in combi-

nation, to justify reduction of sentence. The death penalty has been upheld in several cases in which the defendant was younger than appellant's 21 years at the time of the crime. *State v. Lashley,* 667 S.W.2d 712, 716 (Mo. banc 1984), cert. denied, 469 U.S. 873, 105 S.Ct. 229, 83 L.Ed.2d 158 (1984) (17 years old); *Battle,* 661 S.W.2d at 488, 494 (18 years old); *Trimble,* 638 S.W.2d at 730 (20 years old). It has also been upheld in cases where evidence was presented to show the defendant's limited intelligence and/or intoxication prior to the murder. *Gilmore,* 681 S.W.2d 934; *Preston,* 673 S.W.2d 1; *Smith,* 649 S.W.2d 417. Finally, although appellant voluntarily returned to Doniphan, he instructed David Smith to tell a false story to law enforcement officials.

Upon consideration of the crime, the defendant and other cases in which the penalty of death was imposed, we find the sentence of death was neither excessive nor disproportionate in this case. We also find that appellant's sentence was not imposed under the influence of passion, prejudice or any other arbitrary factor.

The judgment of the trial court is affirmed.

All concur.